In re AMERICAN CONTINENTAL COR-
PORATION/LINCOLN SAVINGS AND
LOAN SECURITIES LITIGATION.

Sarah B. SHIELDS, et al., Plaintiff,

v.

Charles H. KEATING, Jr.,
et al., Defendant.

Charles ROBLE, et al., Plaintiffs,

v.

ARTHUR YOUNG & CO.,
et al., Defendants.

No. MDL 834.
Nos. Civ 90–566 PHX–RMB to CIV 90–
570 PHX–RMB, CIV 90–574 PHX–
RMB and CIV 90–1270 PHX–RMB.

United States District Court,
D. Arizona.

Jan. 7, 1992.

See also 779 F.Supp. 1053.

game, Cal., Ronald Rus, Alvarado, Rus & Worcester, Orange, Cal., for First Baptist.

Clayton R. Janssen, Janssen, Malloy, Marchi, Needham & Morrison, Eureka, Cal., for Ralph H. Rankin and Dorothy L. Rankin.

William B. Hirsch, Lieff, Cabraser & Heimann, San Francisco, Cal., for Judith Sims.

P. John Owen, Kristin L. Farnen, Nancy L. Shelledy, J. Emmett Logan, Morrison & Hecker, Phoenix, Ariz., for plaintiff Resolution Trust Corp. and defendant Lincoln Sav. and Loan Ass'n.

Stuart L. Kadison, George W. McBurney, Sidley & Austin, Los Angeles, Cal., for Arthur Andersen & Co.

Miles N. Ruthberg, Meryl Macklin, Laurence Popfsky, Heller, Ehrman, White & McAuliffe, Los Angeles, Cal., for Arthur Young & Co., Ernst & Young and Jack Atchison.

Wayne W. Smith, Gail E. Lees, James Behrendt, Byron Wilder, Gibson, Dunn & Crutcher, Los Angeles, Cal., for Touche Ross & Co.

Dan K. Webb, Thomas J. Frederick, Winston & Strawn, Chicago, Ill., for Lexecon, Inc.

Laura B. Hoguet, Joan Morgan McGiver, White & Case, New York City, for Bankers Trust.

C. Randolph Fishburn, Katherine T. Haracz, White & Case, Los Angeles, Cal., for Bankers Trust.

Richard Sander, Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, Minn., for Offerman & Company, Joseph Offerman and Scott Offerman.

Max Gillam, Brian Ropelle, Latham & Watkins, Los Angeles, Cal., for Jones, Day, Reavis & Pogue and William J. Schilling, Ronald Fein.

Leonard B. Simon, Kevin P. Roddy, Milberg Weiss Bershad Specthrie & Lerach, San Diego, Cal., for Shields.

Joseph W. Cotchett, Susan Illston, Allan Steyer, Cotchett, Illston & Pitre, Burlin-

David J. Brown, Brobeck, Phleger & Harrison, San Francisco, Cal., for Indus. Indem. Corp.

Vincent E. Nowak, McKool Smith, Dallas, Tex., for Gene E. Phillips.

Henry C. Kasson, Taft, Stettinius & Hollister, Cincinnati, Ohio, for Star Bank, N.A., Cincinnati.

Steven M. Pincus, Lindquist & Vennum, Minneapolis, for First Bank Nat. Ass'n (formerly First Bank of Minneapolis).

Lisa Coulter, Snell & Wilmer, Phoenix, Ariz., for Troutman, Sanders, Lockerman & Ashmore.

Marvin G. Pickholz, Stroock & Stroock & Lavan, Washington, D.C., for Jack Atchison.

## MEMORANDUM OPINION AND ORDER

BILBY, District Judge.

Defendants seek decertification of the plaintiff class in these consolidated federal and state actions. Class plaintiffs purchased securities issued by American Continental Corporation ("ACC"), parent company to Lincoln Savings and Loan Association ("Lincoln"). The failure of the ACC/Lincoln enterprise precipitated the present actions against chairman Charles H. Keating, Jr., ACC/Lincoln directors and officers, lawyers, accountants and others. These Motions to Decertify were initially brought by the accountant and lawyer Defendants, and other Defendants join in.

In general, Plaintiffs allege that a multifarious scheme to defraud was perpetrated by the directors and officers of ACC/Lincoln and assisted in numerous respects by accountants, lawyers, and others. The alleged scheme involves a far-reaching plait of deceit, including: (1) sham transactions in which ACC/Lincoln recorded phantom profits that fundamentally inflated the apparent strength of ACC/Lincoln and its securities; (2) violations of federal banking regulations governing direct investments and affiliated transactions, (3) truculent dealings with federal regulators, in which Defendants made material misrepresentations about ACC/Lincoln's operations and financial condition; (4) materially false and misleading public statements, such as press releases, registration statements, prospectuses, and other filings with the Securities and Exchange Commission ("SEC"); and (5) a scheme to upstream dollars from Lincoln to ACC through an illegal tax sharing agreement. In addition, Plaintiffs allege that Defendants contrived a scheme to sell stock and bonds by misrepresenting and omitting information concerning the soundness of ACC's financial condition.

As a result of Defendants' acts, Plaintiffs contend that Defendants violated Section 10(b) of the Securities Exchange Act of 1934, Sections 11 and 12 of the Securities Act of 1933, Sections 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), California Corporations Code §§ 1507 and 25401, common law doctrines of fraud and misrepresentation, and breach of fiduciary duty.

These consolidated actions originated in federal and state courts in California. In the federal action, Judge Stephen V. Wilson of the United States District Court for the Central District of California certified a single class comprising purchasers (with certain exceptions) of ACC securities from January 1, 1986 to April 14, 1989. Order Re Class Certification, No. CV 89–2052 SVW (Dec. 27, 1989). In the state action, the Plaintiff class was certified by Judge David G. Sills in the Superior Court of the State of California for the County of Orange. Minute Order, No. 58 93 02 (May 3, 1990).

### I.

In both the state and federal actions, class certification is appropriate only if the prerequisites of Federal Rule of Civil Procedure 23(a) are met:

(1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

In addition, the evidence must sustain the conclusion that "the questions of law or fact common to the class predominate over questions affecting only individual members, and that a class action is superior to

other methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3). Class certification may be upheld only "if the trial court is satisfied, after rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 161, 102 S.Ct. 2364, 2372, 72 L.Ed.2d 740 (1982).

Defendants' motions are directed at those class members who, in purchasing debentures, allegedly relied upon oral sales presentations or receipt of a prospectus.[1] Defendants contend the record establishes that the presentations were not uniform, and thus, questions of individual reliance predominate over those common to all Plaintiffs. In addition, Defendants contend that those class members who received prospectuses are not entitled to a presumption of reliance arising out of the "fraud-on-the-regulatory-process" theory or any related doctrine, and must therefore demonstrate reliance individually. Defendants further argue that decertification of the state plaintiff class is inappropriate because California law does not support class treatment for Plaintiffs' claims. Finally, Defendants contend that the ACC employee stock ownership plan ("ESOP") is not an appropriate class member because the plan participants are not class members, and furthermore may be entitled to differing allocations of any class recovery. Therefore, the central issue in this case is whether, in light of the evidence before the court, common issues predominate over those particular to the individual class members.[2]

## II.

Rule 10b–5, implementing Section 10(b) of the Securities Exchange Act of 1934, provides in relevant part:

It shall be unlawful for any person directly or indirectly . . .

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5. Thus, to succeed under Section 10(b) and Rule 10b–5, Plaintiffs carry the burden of proving that, in connection with the sale of securities, Defendants committed (or aided and abetted): (1) a misrepresentation or omission of a material fact; or (2) a scheme or artifice to defraud; or (3) a practice or course of conduct which operated as a fraud or deceit. Plaintiffs must further demonstrate that Defendants committed these acts with scienter, and that Plaintiffs justifiably relied and were thereby damaged. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Basic Incorporated v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

Significantly, Plaintiffs' case is not predicated exclusively or even predominantly on Rule 10b–5(b). The central issue is whether Defendants orchestrated and/or aided and abetted a far-reaching scheme to inflate the apparent worth and prospects of ACC/Lincoln, while simultaneously concealing its latent but material weaknesses. These allegations are consonant with § 10b–5(a) and (c).

Rule 10b–5 liability is not restricted solely to isolated misrepresentations or omissions; it may also be predicated on a "practice, or course of business which operates as a fraud. . . ." Under that section class members may well be unit-

---

[1.] Defendants do not challenge Judge Wilson's ruling that class members who purchased ACC stock may invoke a presumption of reliance based on the "fraud-on-the-market" theory. *Basic Incorporated v. Levinson,* 485 U.S. 224, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Blackie v. Barrack,* 524 F.2d 891 (9th Cir.1975), *cert. de-*

*nied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976).

[2.] For purposes of this motion, the parties do not dispute the remaining requirements of Federal Rule of Civil Procedure 23(a) and (b).

ed in establishing liability for fraudulently creating an illusion of prosperity and false expectations.

*Blackie,* 524 F.2d at 903, n. 19. Additionally, Plaintiffs' RICO claims are predicated primarily on fraud in the sale of securities. The proof requirements under this claim parallel those of Rule 10b–5, and therefore "the vast majority of factual and legal issues will be common to the class." Order re Class Certification at 14.

## A. The Principles of *Basic v. Levinson*

The outcome of these motions is controlled by principles articulated in *Basic v. Levinson, supra,* where the United States Supreme Court clarified the reliance and materiality standards of § 10(b) and Rule 10b–5. In *Basic,* the Court reasoned that reliance is an ingredient of a Rule 10b–5 cause of action because it "provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic,* 108 S.Ct. at 990. Causation and its principal indicator, reliance, are the products of an equation in which common sense and probability are the fundamental givens, and materiality the multiplier. *Id.* at 991.

Direct and individualized proof of reliance, however, is not the only way to demonstrate that a defendant's misrepresentation caused a plaintiff's harm. "[T]he same causal nexus can be adequately established indirectly, by proof of materiality coupled with the common sense that a stock purchaser does not ordinarily seek to purchase a loss." *Id.* at 990 (citing *Blackie,* 524 F.2d at 908). In *Basic,* the Court therefore found a presumption of reliance appropriate in certain cases in light of fairness, public policy, probability, and the interests of judicial economy. *Basic,* 108 S.Ct. at 992.[3] This concept of indirect proof is labelled the "fraud on the market theory:"

The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available *material information* regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Id.* at 988 (emphasis added).

Thus, materiality is a critical ingredient in the court's formula. In *Basic,* the Court defined the materiality standard, stating that " 'there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.' " *Id.* 108 S.Ct. at 983 (quoting *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)).

In addition, the Court observed that modern securities markets differ significantly "from the face-to-face transactions contemplated by early fraud cases." *Id.* 108 S.Ct. at 990. Flexibility is therefore necessary if the law is to fulfill the fundamental purposes of the securities laws. Defendants urge that this conviction delimits the *Basic* decision to transactions on the open securities market, and that a presumption is inappropriate here. This court disagrees. The principles of *Basic* apply equally to the type of securities fraud alleged here. Moreover, the proof problems associated with a fraudulent scheme to register and sell subordinated debentures out of the offices of a savings and loan institution are comparable to those facing purchasers of open market securities.

In light of the analysis below, this court finds that Plaintiffs have made sufficient showing of materiality and reliance to support class certification.

---

**3.** *Basic* also held that defendants may attempt to rebut the presumption by offering proof which severs the causal link between a defendant's course of conduct and a plaintiff's investment decision. On the facts of *Basic,* this would involve a showing that the misrepresentation did not affect market price, or that the purchaser did not rely on the integrity of the market price. *Basic,* 108 S.Ct. at 992.

### B. Uniform Sales Presentation As Common Question and Basis for Presumed Reliance

■ Class actions are appropriately utilized in situations where a "standardized sales pitch" is employed. *See Grainger v. State Sec. Life Ins. Co.*, 547 F.2d 303, 307–08 (5th Cir.1977). Under this theory, a showing that the sales presentations were uniformly patterned on a known model provides certitude that material misrepresentations were a causative factor in each plaintiffs' decision. Thus, a class action may be maintained where plaintiffs can establish that the sales agents' representations did not vary in material respects. *Id.* at 307.

■ Defendants urge a talismanic rule that a class action may not be maintained where a fraud is consummated principally through oral misrepresentations, unless those representations are all but identical. Such a view overlooks, however, the design and intent of both Fed.R.Civ.P. Rule 23(b) and Section 10(b). "The fact is that Congress, by authorizing and approving Rule 23(b)(3), created a vehicle to put small claimants in an economically feasible litigating posture." *Blackie*, 524 F.2d at 899. Equally important is the essential purpose of the federal securities laws—to protect investors against dishonest practices. *Basic*, 108 S.Ct. at 982. In fact, "the ultimate effectiveness of [the security anti-fraud laws] may depend on the applicability of the class action device." *Blackie*, 524 F.2d at 903 (quotations omitted) (brackets in original).

Although the representations made to the bond purchasers in this case were not identical, they were sufficiently uniform to warrant class treatment. The evidence paints a classic picture of indirect reliance—material representations made to bond representatives with the intent and knowledge that they would be communicated to the ultimate buyers. The testimony of both bond salespersons and bond representatives comprise a showing that a common sales approach was conceived by ACC/Lincoln management and communicated to ACC/Lincoln bond sales representatives with the expectation that it would be conveyed by them to prospective bond purchasers. This alleged strategy involved these principal cornerstones: (1) use of Lincoln Savings as a drawing card to attract potential purchasers, thereby exploiting their trust and confidence; (2) compliance with the letter of the law by, for example, handing out requisite prospectuses and informing potential purchasers that the bonds were not federally insured; (3) deemphasis or rationalization of risks or negative publicity associated with ACC/Lincoln and the bonds; (4) omission of information about defects in ACC/Lincoln's economic prospects; (5) utilization of a crew of earnest apostles to proclaim ACC/Lincoln's virtues; (6) repeated stress on ACC/Lincoln's size, diversity, and invincible financial strength; and, (7) emphasis on ACC's status as parent of Lincoln Savings.

This centrally orchestrated strategy is evident throughout the testimony of bond representatives, who were both recipients and purveyors of information. The testimony of bond purchasers reveals that they were consistently informed that the bonds were backed by ACC, a sound multibillion dollar company and parent of Lincoln. Conspicuously absent from the record is testimony that these bond purchasers were told of precariousness, or real and present risk, in connection with ACC/Lincoln's financial condition or relationship with regulators. As a result of these sales, both out of and in association with Lincoln Savings and Loan Association, the message was communicated to purchasers that the bonds had the benefit of the federal regulation and protection appurtenant to a savings and loan.

> Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions, and that the issue may profitably be tried in one suit.

*Blackie*, 524 F.2d at 902. The court finds the class at issue is united by a common interest in determining whether Defendants' course of conduct is actionable, and therefore, finds decertification inappropriate.

Plaintiffs' claims and the record before this court differ from those found in cases relied upon by Defendants. *See generally Clark v. Watchie*, 513 F.2d 994 (9th Cir.), *cert. denied*, 423 U.S. 841, 96 S.Ct. 72, 46 L.Ed.2d 60 (1975); *Blakely v. Lisac*, 357 F.Supp 267 (D.Or.1972); *McHan v. Grandbouche*, 99 F.R.D. 260 (D.Kan.1983); *Simon v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 482 F.2d 880 (5th Cir.) *reh'g denied*, 485 F.2d 687 (5th Cir.1973); *Graham v. Security Savings & Loan*, 125 F.R.D. 687 (N.D.Ind.1989), *aff'd*, 914 F.2d 909 (7th Cir.1990); *Seiler v. E.F. Hutton & Co.*, 102 F.R.D. 880 (D.N.J.1984); *Moscarelli v. Stamm*, 288 F.Supp. 453 (E.D.N.Y. 1968); *Soper v. Valone*, 110 F.R.D. 8 (W.D.N.Y.1985); *Glick v. E.F. Hutton & Co.*, 106 F.R.D. 446 (E.D.Pa.1985). In the present action, the breadth and magnitude of the fraud alleged and the size of the plaintiff class are far greater. The center of gravity of the fraud transcends the specific details of oral communications. Furthermore, the alleged fraud was not conceived or perpetrated by the bond representatives themselves. Rather, they were merely conduits of information communicated to them by or with the help of Defendants.

Moreover, the gravamen of the alleged fraud is not limited to the specific misrepresentations made to bond purchasers. The allegation is of a whole roster of deception designed to contrive a false image of ACC/Lincoln. Defendants allegedly represented the integrity of their operations to Plaintiffs through Lincoln offices, using regulatory documents such as prospectuses and registration statements, brochures, and pictures of impressive holdings. Sham accounting allegedly enabled Defendants to mask ACC/Lincoln's weaknesses, while substantially skewing its worth. Misrepresentations to regulators allegedly effected and perpetuated ACC's very license to own and operate Lincoln Savings. The exact wording of the oral misrepresentations, therefore, is not the predominant issue. It is the underlying scheme which demands attention. Each plaintiff is similarly situated with respect to it, and it would be folly to force each bond purchaser to prove the nucleus of the alleged fraud again and again.

Defendants commend to the court a decision by the Middle District of Florida, *Kaser v. Swann*, Fed.Sec.L.Rep. (CCH) § 96,-187, at 90,999, 1991 WL 214071 (M.D.Fla. 1991), a case which bears some factual resemblance to the case at bar, but is not controlling. Plaintiffs there purchased subordinated notes in the lobbies of American Pioneer Savings Bank branches. Plaintiffs alleged that American Pioneer, which was ultimately placed in RTC conservatorship, misled the public about its financial condition by "falsely characterizing the loan losses of the bank as 'investments' and 'joint ventures' and by overstating American's net worth." *Id.* at 91,000. The court found the oral statements were not sufficiently uniform to support class certification, observing that "no proof appears in the deposition testimony to demonstrate that all the bank employees used a standardized sales pitch." *Id.* at 91,001. By contrast, a showing has been made in this record that ACC/Lincoln repeatedly emphasized predominant interrelated themes, which originated from management, and were sustained by ACC/Lincoln's far-reaching, and allegedly fraudulent, course of conduct.

#### C. Fraud in the Offering

The "fraud in the offering" doctrine evolved from principles analogous to those affirmed in *Basic v. Levinson, supra*, and was employed in a series of cases upon which Plaintiffs rely. *See Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981), *cert. denied*, 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983); *Kirkpatrick v. J.C. Bradford & Co.*, 827 F.2d 718 (11th Cir.1987), *cert. denied*, 485 U.S. 959, 108 S.Ct. 1220, 99 L.Ed.2d 421 (1988); *T.J. Raney & Sons, Inc. v. Ft. Cobb, Oklahoma Irrig. Fuel Auth.*, 717 F.2d 1330 (10th Cir.1983), *cert.*

*denied,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984).

In the *Shores* decision, the plaintiffs claimed fraud arising out of a course of conduct prohibited by Rule 10b–5(a) and (c). Unlike *Basic,* which turned primarily on misrepresentation of a single material fact, the *Shores* defendants were accused of a "pervasive scheme" by which they "fabricated a materially misleading Offering Circular in order to induce the Industrial Development Board to issue, and the public to buy, fraudulently marketed bonds." *Id.* at 464. The court held:

> The concept of this scheme to defraud satisfies the requirement of "transaction causation." It has as its core objective that the potential victim engage in the transaction for which the scheme was conceived. The requisite element of causation in fact would be established if [plaintiff] proved the scheme was intended to and did bring the Bonds onto the market fraudulently and proved he relied on the integrity of the offerings of the securities market. His lack of reliance on the Offering Circular, only one component of the overall scheme, is not determinative.

*Id.* at 469 (citing *Blackie, supra* ). Observing that the securities laws "reach complex fraudulent schemes as well as lesser misrepresentations or omissions," *Id.* at 470, the court ruled:

> The theory is not that he bought inferior bonds, but that the Bonds he bought were fraudulently marketed. The securities laws allow an investor to rely on the integrity of the market to the extent that the securities it offers to him for purchase are entitled to be in the marketplace.

*Id.* at 471. Subsequently, the Fifth Circuit reiterated the *Shores* reasoning:

> In fraud claims asserted under Rules 10b–5(1) and (3), the reliance element of Rule 10b–5 may be satisfied by proof that the plaintiff relied on the integrity

of the market rather than on specific representations by the defendants.

> The issue of reliance on an open market thus turns on a matter of degree—the price of the security—and not, as in *Shores,* the absolute question of whether the security was worthy of being issued.

*Kirkpatrick,* 827 F.2d at 722. Similarly, in *T.J. Raney* the Fifth Circuit concluded:

> [T]he materiality element has been satisfied here by the claim of conspiracy to bring unlawful issuances to market. Here the causation element is fulfilled by proof that but for the conspiracy and the acts committed pursuant to it, the securities could not have been issued. Securities laws must be interpreted flexibly and progressively, not technically nor grudgingly, to fairly effectuate their remedial purpose.

*T.J. Raney,* 717 F.2d at 1333.

■ Defendants contend that this entire line of reasoning has been discredited by subsequent developments in *Shores,*[4] by *Basic, supra,* and by *Abell v. Potomac Insurance Company,* 858 F.2d 1104 (5th Cir.1988), *vacated and remanded on other grds,* 492 U.S. 914, 109 S.Ct. 3236, 106 L.Ed.2d 584 (1989). This court disagrees because the justification for this authority is consistent with the materiality and reliance principles endorsed by *Basic.* If an enterprise is so laden with fraud that its entire public image is distorted, it is sensible to presume that reasonable investors relied on many material misrepresentations which, in aggregate, created a false image. In this situation, the offending misrepresentations are not merely presumed to compete successfully for the investor's attention amidst a mix of material, undistorted facts. Rather, the entire picture of the company's economic health and lawful character is skewed. In *Basic,* the Supreme Court acknowledged that the materiality standard may not always "admit straightforward application." *Basic,* 108

---

**4.** The original *Shores* reasoning was reaffirmed by the Eleventh Circuit in *Shores II,* 844 F.2d 1485 (11th Cir.1985), but the opinion was vacated on other grounds, and in *Shores III,* 885 F.2d 760 (11th Cir.1989), the five-member majority declined to reach the fundamental class certification issue, while the four concurring judges intimated the continued viability of the *Shores II* opinion. *Shores III,* 885 F.2d at 766.

S.Ct. at 983. But there is virtually nothing more material to a decision to invest in the subordinated debt of a company than a reliable, undistorted picture of its financial integrity. Even in the face of high interest rates, no reasonable investor would "knowingly roll the dice in a crooked crap game." *Basic*, 108 S.Ct. at 991 (citation omitted).

Moreover, even if *Abell* is construed as limiting the scope of *Shores* and its progeny, its holding does not reach the facts of this case. In *Abell*, the court was presented with a handful of material misrepresentations which occurred early in what proved to be an ongoing concern. Although the court was satisfied that the misrepresentations were material, and were factors in the company's ultimate failure, the court was not convinced that all of the purchasers had actually relied on the nondisclosure. The court held that a fraud-on-the-market presumption of reliance is available in a limited market only "where the promoters knew that the subject enterprise was worthless when the securities were issued, and successfully issued the securities only because of defendants' fraudulent scheme." *Abell*, 858 F.2d at 1122–23.

■ This court declines to adopt *Abell*'s holding in a literal sense for three reasons. First, a promoter's knowledge is not determinative of plaintiffs' reliance under *Basic*. Rather, presumed reliance is a function of materiality coupled with the common sense and probability that investors will behave reasonably. *Basic, supra.* Second, as the Fifth Circuit acknowledged, worthlessness is not the key since "saleable assets may bless even the most worthless enterprise." *Abell*, 858 F.2d at 1122. Finally, a scheme to create a worthless enterprise may well be less lucrative than a scheme to defraud investors over the course of an ongoing business. A rule based entirely on worthlessness, therefore, could render the most sophisticated fraud beyond reach. The court holds that Plaintiffs are entitled to the benefit of a presumption of reliance here because the alleged scheme to defraud is of such pervasive materiality as to generally and fundamentally distort the public representations concerning the company.

Finally, in *Abell*, the court was presented with a record where "neither side introduced *any* evidence to demonstrate or refute whether most of the class members decided to buy [the bonds] in reliance upon what the defendants said or failed to say." *Id.* at 1118 (emphasis in original). By contrast, in the present case, Plaintiffs have made a showing sufficient to support an inference that they are stationed similarly with respect to the alleged scheme to defraud, and did, in fact, rely on information communicated to them indirectly by ACC/Lincoln management.

### D. Fraud on the Regulatory Process

■ Judge Wilson held that those Plaintiffs who received prospectuses are entitled to a presumption of reliance based on the integrity of the regulatory process underlying the prospectus. Order re Class Certification, at 10. This court finds that Judge Wilson's ruling should now be extended beyond those Plaintiffs who received a prospectus.

The Ninth Circuit ratified the fraud on the regulatory process doctrine in *Arthur Young & Co. v. United States District Court*, 549 F.2d 686 (9th Cir.) *cert. denied* 434 U.S. 829, 98 S.Ct. 109, 54 L.Ed.2d 88 (1977). The court held, and Judge Wilson reiterated:

> Just as the open market purchaser relies on the integrity of the market and the price of the security traded on the open market to reflect the true value of securities in which he invests, so the purchaser of an original issue security relies, at least indirectly, on the integrity of the regulatory process and the truth of any representations made to the appropriate agencies and the investors at the time of the original issue.

*Arthur Young*, 549 F.2d at 695; Order re: Class Certification, at 9–10. Defendants argue that the viability of this doctrine is in doubt, citing *Basic*, 108 S.Ct. at 993, n. 2 (White, J., concurring).[5] Defendants fur-

---

**5.** In his concurring and dissenting opinion, Jus-   tice White expressed the view that the majority

ther maintain that the doctrine is unsupportable because, for example, the SEC does not necessarily review prospectuses, and therefore Plaintiffs could not rely on the regulators to ensure the truth of information contained therein. Moreover, Plaintiffs cannot prove that the regulators relied on the misrepresentations, in light of the deliberative process privilege, which protects regulatory decision making from scrutiny. The court rejects these arguments as inapplicable to this case.

Plaintiffs' claims are premised on Rule 10b–5(a) and (c). The regulatory fraud they allege was designed to prevent regulators from stepping in to protect the public interest. Considering once again the synthesis of materiality, common sense, and probability, it is highly likely that such fundamental deceit, if true, would be a material factor in an investor's decision. For reasons entwined with those underpinning the closely related "fraud in the offering doctrine," Plaintiffs here are entitled to a presumption of reliance if a network of misrepresentations or omissions to the Federal Home Loan Bank Board or other federal and state regulators enabled the bond sales to go forward. This does not run counter to Justice White's concerns because, under these circumstances, a plaintiff would not have been harmed merely by a misrepresentation which regulators did not pick up and which may or may not have been a determinant in an investment decision. Rather, an investor would have been harmed by the regulators' failure to step in at all. Such an investor would have in all likelihood relied on the integrity of the regulatory process to ensure that at a fundamental level the securities were entitled to be marketed.

Furthermore, the record supports an inference that the bond purchasers did, in fact, rely. A unifying theme throughout is that the purchasers may have been heavily influenced by the way the bonds were mar-

keted by and through Lincoln Savings. The evidence raises an inference that debenture purchasers relied, in both direct and subtle ways, on ACC's authority to own and operate a federally-insured institution, as an indicator of its financial integrity and veracity.

### E. California Law

■ For the same reasons described heretofore, the wrongs alleged and evidence adduced also support class treatment under the law of the state of California. *Occidental Land, Inc. v. Superior Court of Orange County*, 18 Cal.3d 355, 134 Cal. Rptr. 388, 556 P.2d 750 (1976); *Vasquez v. Superior Court of San Joaquin County*, 4 Cal.3d 800, 94 Cal.Rptr. 796, 484 P.2d 964 (1971).

The allegations and evidence in this case are consistent with California's indirect reliance doctrine and therefore, form an acceptable basis for class certification under California law. Defendants concede that California's indirect reliance doctrine derives from *Restatement (Second) of Torts*, § 533 (1977), which provides in pertinent part:

> The maker of a fraudulent misrepresentation is subject to liability . . . to another who acts in justifiable reliance upon it if the misrepresentation, although not made directly to the other, is made to a third person and the maker intends or has reason to expect that its terms will be repeated or its substance communicated to the other, and that it will influence his conduct in the transaction . . .

"The requirement that reliance must be justified in order to support recovery may also be shown on a class basis. If the court finds that a reasonable man would have relied upon the alleged misrepresentations, an inference of justifiable reliance by each class member would arise." *Vasquez*, 94 Cal.Rptr. at 805, 484 P.2d at 973.

---

opinion "rejects the version of that theory, heretofore adopted by some courts, which equates 'causation' with 'reliance,' and permits recovery by a plaintiff who claims merely to have been *harmed* by a material misrepresentation which altered a market price, notwithstanding proof

that the plaintiff did not in any way *rely* on that price." *Basic*, 108 S.Ct. at 993 (White, J., concurring) (emphasis in original). *Arthur Young* was among the cases cited without additional comment in a footnote.

Plaintiffs are entitled to attempt to prove that centrally orchestrated misrepresentations and omissions about the company's strength and stability were handed down from management and communicated through Lincoln's bond sales staff to Plaintiffs. *See Varwig v. Anderson–Behel Porsche/Audi, Inc.*, 74 Cal.App.3d 578, 580–81, 141 Cal.Rptr. 539 (1st Dist.1977). *Comm. on Children's Television, Inc. v. Gen. Foods Corp.*, 35 Cal.3d 197, 219, 197 Cal.Rptr. 783, 673 P.2d 660 (1983).

### F. ACC ESOP

■ Defendants further contend that the ACC employee stock ownership plan ("ESOP") is not an appropriate class member. Defendants argue that the plan participants are not class members, and may be entitled to differing allocations of the class recovery. This court holds that the ACC ESOP is situated similarly to other members of the Plaintiffs class with respect to the broad contours of the wrongdoing alleged. Specific allocations of any proceeds due non-insider plan participants as a result of recovery by the ESOP itself are secondary to the predominate issue of Defendants' culpability to securities purchasers as described above.

### III.

■ When determining the appropriateness of class certification, this court does not determine the merits of the claims. Nevertheless, the court must make a rigorous analysis of the evidence presented to ensure that common issues predominate. On these motions for class decertification, the court has reviewed the testimony and evidence concerning communications by bond representatives to bond purchasers, and has found sufficient evidence to support class treatment. The discussion below is a portion of the evidence relied upon by this court, and is not to be construed as a listing of the evidence in its entirety.

Examples of Bond Representative Testimony

1. Numerous bond representatives testified that they told bond purchasers the bonds were not insured. Victoria Adriano Bayona Tr. 5/6/91 at 33; Mark Johnson Tr. 6/12/91 at 43; Crystal D'Amico Tr. 5/15/91 at 43; Douglas J. Lagerstrom Tr. 1/23/91 at 133; Amy Hirshfield Staley Tr. 6/18/91 at 49.

2. Numerous bond representatives testified that they were instructed to and did give bond purchasers a prospectus. Many testified that they provided a packet of written materials including the annual report, bond prospectus, and/or registration statement. Laura Powers Tr. 3/6/91 at 40; Michael Mefzger Tr. 3/4/91 at 22; Ronald Sjoberg, Tr. 6/14/91 at 33; Ana Patricia Dak Tr. 3/13/91 at 26; Beverly Figeira Tr. 1/9/91 at 22; Douglas Perry Kempt Tr. 3/12/91 at 18; Lagerstrom Tr. 1/23/91 at 134; Gus Martin Tr. 7/24/91 at 24, Hirshfield Staley Tr. 6/18/91 at 50; Scott White Tr. 9/12/91 at 43; Lito Navarra Tr. 9/13/91 at 52; Christine Fujioka Tr. 7/26/91 at 103; Bayona Tr. 5/6/91 at 39; Christine Turner Tr. 9/11/91 at 47; Margaret Youngblood Tr. 9/12/91 at 124.

3. Bond representatives used whatever they had been given by management to sell the bonds—the prospectus, annual reports, Forbes magazine articles. D'amico Tr. 5/15/91 at 203; Kilmarx Tr. at 60.

Testimony such as the following was typical:

4. "I don't recall making specific qualifications about the investment. I recall making stipulations about the company. I can recall saying things like the bond's as safe as the company, its backed by the assets of the company, and here's how safe the company is, da-de-da-de-da ... I can remember saying that the earning power of Lincoln Savings' assets backed up the investment they had, but I don't recall saying that the assets of Lincoln backed up the bond." Lagerstrom Tr. 1/23/91 at 179.

5. "[I]f I had a spiel, the one part I do remember was: 'These are backed by the full faith and credit of American Continental Corporation.'" White Tr. 9/12/91 at 56.

6. "[T]here's a few facts we all were just grilled on about American Continental Corporation, you know, diversified financial holdings, so much in assets, and they had this number of subsidiaries." Brian Cianfichi Tr. 7/30/91 at 38.

7. Julie Bovay was asked whether she had been taught to recite a "canned sales pitch." She answered: "Well, I view a canned sales presentation as something that you memorize, maybe practice in front of a mirror or try out on your friends and your mom, whatever, which I did not have. I viewed it from the aspect of a conversation. If a prospective bond customer or an existing bond customer or anyone were to come up to me and ask me about American Continental bonds, it would depend on his or her interests and questions how I would respond and what I would say. Now, in the sense of my responses, they were pretty much very consistent and almost programmed, because there were only so many answers to the questions, and there were also only so many questions that were asked." Bovay Tr. 9/13/90 at 137–138.

Bond representatives attended frequent meetings which were scheduled as issues arose. Newspaper and magazine articles were the focus of bond representative meetings. Bond representatives testified that they were told to focus on the strength of ACC's asset holdings.

8. "I attended office meetings where I was told that the way of getting around the negative aspects of buying the bonds, such as not being insured, was to advise prospective investors that the bonds are backed by over $5 billion in assets from their parent company, American Continental, and that this company had never defaulted on any previous security that it had sold in the past." Johnson Tr. 6/12/91 at 49 (quoting Declaration for California Department of Corporations).

9. The bonds were "backed by the full faith and credit of ACC." D'Amico Tr. 5/15/91 at 118; Youngblood Tr. 9/12/91 at 123.

10. Robyn Wilder was not told at bond representative meetings that the risk should be left unmentioned, but rather that it "should be played down or diminished." She was led to believe that ACC was "very financially sound" and told prospective buyers the bonds were "backed by the ability of American Continental to repay a debt and that the assets of American Continental were very strong." Wilder Tr. 9/17/91 at 110. "I did tell customers they were safe, relatively safe, that it was not a high risk investment." Wilder Tr. 9/17/91 at 111.

11. "We just tell the customer how strong ACC is at the time. The company is really strong at the time. We tell them like figures like how much assets ACC has." Bayona Tr. 5/6/91 at 32.

12. Theresa Ventimiglia was told at bond representative meetings that ACC was in a strong financial position. Ventimiglia Tr. 9/16/91 at 35.

13. "We were told [the bonds] were backed by the strength of the company. We felt that the company was extremely strong." Fujioka Tr. 7/26/91 at 62.

14. The bonds "were backed by the assets of American Continental." Peter Kilmarx Tr. at 59.

15. "The policy at Lincoln had always been to provide a lot of financial information and to discuss articles that came out in the papers, whether they were favorable or unfavorable, and bring up any questions and answer them.... Virtually anything that came out, whether it was an Orange County Register article or a magazine piece would be discussed in meetings." Debra Millard–Schwartz Tr. 9/16/91 at 89, 91.

16. Sharon Aragon, a financial services representative, testified: "[T]hey gave us little cheat sheets that had just the assets.... Just for exam-

ple, one was that they owned a billion dollars worth of land, which made them the largest private land owner in Arizona. That was just one of the things on there, or 6.1 billion in assets." Aragon Tr. 7/22/91 at 69–70.

17. "We were told to focus on the positives; focus on the strength of the company as far as the asset size, the hotels, the land, the insurance companies." Aragon Tr. 7/22/91 at 35.

18. In January 1989 the bond representatives were flown to Phoenix. "It was at the time of all the bad press ... and they wanted us to see the products of American Continental as far as their hotels and just some of the land, and just go up there and see the Phoenician. So it would be more of a motivational meeting for us so when we came back we could tell the customers we saw this. This is, you know, just more sell it on what we'd actually seen." Aragon Tr. 7/22/91 at 49; *See also* Rocio Escobar Tr. 3/11/91 at 90; Figeira Tr. 1/9/91 at 140–142.

19. "I felt we were, we always were given an answer from corporate, that level of communication was open, and any time there was anything in the paper, they contacted us so we would be able to better sell the product. So we were told exactly what to say at that point. So as far as anything that's said, it was said to me, and it was reiterated through what was said to me." Aragon Tr. 7/22/91 at 156.

20. "Q. Did you understand that there was at least some risk that the bondholders might lose their money?

A. Never. I deposited $12,000 in one of these bonds.

Q. When you deposited the $12,000 in one of the bonds, did you feel that there was absolutely no risk?

A. Absolutely no risk. I would never have deposited a penny if I thought there was. And we certainly wouldn't have sold them if we thought there was any risk." Diana Walker Tr. 7/25/91 at 43–44.

Bond representatives testified that former Lincoln employees were used as sales representatives, and that Lincoln's goodwill was a factor in the sales. For example:

22. "[A] lot of customers trusted me already because they know me already."

Q. "They knew you from your performance of your teller duties as a Lincoln employee?" A. "Yes." Bayona Tr. 5/6/91 at 60.

23. "Most of the customers believed in Lincoln, and if, you know, they felt that if Lincoln—if American Continental was the owner of Lincoln Savings, that they were a good company."

Q. "Did customers tell you that?" A. "Yes, they did." Dak Tr. 3/13/91 at 196.

24. Scott White was asked, "Did you feel that the fact that they were believers in Lincoln Savings helped you to sell the bonds?" He said, "Yes, I believe so. I didn't have to spend a lot more time talking about Lincoln Savings." White Tr. 9/12/91 at 56.

25. "We would call customers whose certificates of deposit were maturing or write them letters." Bovay Tr. 9/13/91 at 21.

### Examples of Bond Purchaser Testimony

The evidence demonstrates that bond purchasers relied on the selling point that ACC was the parent of Lincoln, that ACC and/or Lincoln would stand behind the bonds, and that their investments would be safe.

26. "I made up my mind after they told me that it was backed by Lincoln and that it was insured by Lincoln, and that I had nothing to worry about, that it was an excellent investment." Leah F. Kane Tr. 11/7/89 at 106.

27. "She said, well, if this company went broke that I would lose that

money. But she says, this, like the other guy said: This is a big conglomerate and we own this and we own that and we own this, so I did not have no worries or I did not think I did." Ronald E. Kusel Tr. 7/18/91 at 104.

28. "She—it was very forceful really in telling me that I had no worries and that there were plenty of assets and how it was all part of one." Ruth Harvey Tr. 3/5/91 at 219.

29. "I believe the way it was put was that because they were backed by American Continental, there was no risk; that they were as good as gold." Walker Tr. 7/25/91 at 49.

30. "All the holdings that ACC had, got the Phoenician Hotel, lands and everything. They never went—they were never going to go in bankruptcy." Cesar Martinez Tr. 11/15/91 at 35.

31. "It was part of her sales presentation that, 'We're dealing with a multibillion dollar company; you're sitting here in our office here, we're part of this company; we're all just one big happy family.'" Don Allan Maxfield Tr. 8/8/91 at 91.

32. "It was implied that it was all Lincoln.... She showed me this beautiful picture of the spa, and this is what Lincoln was investing in, this beautiful place near Phoenix, Arizona." Bertha Roble Tr. 11/8/89 at 49.

33. "I figured because of that sign on that door that anything that transpired in there was government insured." Grace Marie Young Tr. 5/1/90 at 435.

34. "[Y]ou buy something from a bank, you feel that it's safe." Mary Haupt Tr. 9/24/91 at 27.

35. Hazel Tramel believed Lincoln backed the bonds. "I don't know what he said in so many words, but we were led to think that they were, by it all being set up there and by it all coming, all information coming from there." Hazel Tramel Tr. 2/19/91 at 53.

36. "I just thought she was an employee of Lincoln Savings." Agnes Mary Malfatti Tr. 8/7/91 at 54.

37. "The bank was quite close to where we lived ... I always go into the bank when a CD of mine matures." Neva Iverson Tr. 2/20/91 at 211–212.

38. Emma Devault was asked why she requested information about the bonds. She said, "there were signs all over the bank" and she was told that "Mr. Keating owned 28 Lincoln banks and I shouldn't, there was no risk." Emma Devault Tr. 6/7/91 at 21.

39. "I asked him about the risk and he said to me not to worry about it because American Continental was a very strong company." Paul Bergmann Tr. 8/5/91 at 68.

40. "[E]verything was strength. He never mentioned anything about weakness." Maxfield Tr. 8/8/91 at 91.

41. "He just mentioned that American Continental was a good, sound organization, paid interest, and see, I had dealt with Lincoln so much that I guess I'm the type of person, I just trusted that would be in their organization." Marguerite Maire Tr. 11/14/89 at 94.

42. "I said who, who are you. He said we are the Lincoln bank, they are the parents. I said what, what they have? He said they have billions and they have hotels and lots of land ..." Esther Bonan Tr. 6/3/91 at 15.

43. "[M]y wife immediately got a little edgy and said, 'Is this FSLIC? Is it insured by the government?' And they said, 'No, but this is indeed even better than a CD, because American Continental has its own insurance companies that will back it up,' and that the government would go broke before it would." John David Keables Brunner Tr.

5/31/91 at 89. "We have our own insurance company and that's American Founders Life ... I remember his words very distinctly, and this was said several times later. 'The government will go broke before American Continental or Lincoln will ever go broke.'" Brunner Tr. at 120–121.

44. "We asked [the Lincoln teller] how reliable the American Continental Corporation was, and if there was any truth to the rumors that we heard about American—or Lincoln and American Continental having a problem with the California banking—whatever the outfit is that controls banking in California. And their answer would always be that there was a vendetta against Charles Keating; and that Lincoln had twice the amount of capitalization that was required ..." Ronald Wright Tr. 6/10/91 at 66.

45. "He said: we own Lincoln Savings and he peeled off four or five other names that I don't remember that they owned. And he says: This is great. He said: This is a great company." Kusel Tr. 7/18/91 at 78.

46. "We knew they were not insured, but we wanted to know that they were safe. He assured us they were safe." Wanda Wright Tr. 6/10/91 at 36.

47. "He told me it was a good deal, it was secure, it was safe, I would have no problem." Annette Cote Tr. 2/21/91 at 46. "I thought you could trust a bank. Can't even trust a bank." Cote Tr. 2/21/91 at 54.

48. "Well, he explained to me that Lincoln was so secure and had so much money. And I remember the one remark that he made was that they actually had more money than the federal depository. He made an analogy as if everybody in the country pulled all their money out of all the banks, the federal depository could not pay it off and Lincoln could pay all the depositors off at one time and not have to take any money from any other sources." Linda Corso de Roo Tr. 6/4/91 at 92.

49. "Q: What I want to know is: what was it that led you to invest in what you later found out to be the ACC bond?

A. I kept thinking back that how safe these people told me if I stay with Lincoln Saving Association; that there's nothing to worry about, Lincoln Saving Association—" Alfrad Nabeta Tr. 6/11/91 at 106.

50. "You have nothing to worry about ... because American Continental is worth $2 billion. It's a real estate developer in Arizona, and they are the parent company of Lincoln Savings, which is worth $500 billion, so you have the backup of Uncle Sam and Lincoln Savings and the real estate backup on American Continental." Cesar Gil Tr. 5/29/91 at 147.

51. "I asked her how—whether it was absolutely safe, and she said yes. And told me that it was backed by the bank and American Continental." Hymen Kublin Tr. 5/17/91 at 86.

52. "What I understood was that he said that it was recommended by both Lincoln and American Continental, and that it was backed by American Continental and Lincoln, and that they were both strong financial institutions." Iverson Tr. 2/20/91 at 81.

53. "I went to the teller there to deposit my money and open an account at Lincoln Savings.... They were just telling us how much American Continental had and what they were doing with it and how much money they were making of it and things like this." Lydia Littleford Tr. 5/10/91 at 155.

54. "He just kept on telling me how strong American Continental was, all the holdings that they had... [I

understood that the bonds were being offered] by Lincoln, by both Lincoln and American Continental, because they were selling them at Lincoln. And I thought they were all part of the family.... He didn't mention anything about insurance. He kept saying that it was just like a CD. I needn't worry about anything ... He kept telling me how strong they were, over and over again.... Both Lincoln and Continental about how strong that they both were." Linda Martinez Tr. 11/15/89 at 41, 49, 50.

55. "Yeah, both people, and going back to the first visit, you know, certainly implicated that the bank was very solid, it was a major institution, billions of dollars in assets, huge revenue." Raymond Parks Tr. 11/17/89 at 124.

56. "Q. Can you recall any information that the person sitting at the desk gave to you or your husband?

A. Only that the bonds were secured by Lincoln and they were a $7 billion firm." Ruth Perelman Tr. 7/15/91 at 67.

57. "And I was talking to the girl in there at the teller's window and a conversation went that we—I asked her about the American Continental, and she says, oh, yes, that's a very, that's a very good company ... that American Continental was the mother company of Lincoln and that—then she introduced me to the young man that was selling. I sat down and talked to him and he give me—he told me how strong the company was.... I asked if they were insured, and he said not by the United States government but we have the protection of American Continental Company which is the owner of Lincoln Savings. It sounded pretty good to me." Ralph H. Rankin Tr. 11/14/89 at 36.

58. Wanda Lee Bean was asked what was the most important factor in deciding to purchase the bonds. "If it was a good investment, and the interest was good, and she sold me on it because she says it was such a good investment, a new type of investment, Lincoln only, backed and insured by Lincoln Savings. She says—and then she says it's like investing in Lincoln Savings, like owning a piece of Lincoln. And that's her words." Wanda Lee Bean Tr. 1/22/91 at 156.

59. "[W]e were just sent over to the teller across the way ... she had said that we would have a better place for our money over there ... it did not occur to us that there was anything different than the rest of the bank." Pat Potter Beck Tr. 7/17/91 at 25.

60. "[H]e was very gung-ho about the bonds. And upon my question who would guarantee the bonds, if these bonds were guaranteed by Lincoln Savings and Loan, he says no, sir, they are not, but it is better because it is guaranteed by American Continental and they own Lincoln Savings and Loan." Bergmann Tr. 8/5/91 at 32.

61. "I said they are insured, by whom? He said by us. The lady was still there ... she said well, by us. I said by you? Who, I wanted to make sure that she tell me. She said Lincoln Bank, they are the parents of Lincoln, and you have nothing to, to worry, they are 10 years strong and they have a very good reputation and—" Bonan Tr. 6/3/91 at 29.

62. "Yes, we discussed it in June, whether they were insured by the government, and he said, 'No, they weren't,' that they were insured, but by American Continental backing the name up with their own insurance company. That they were stronger than the government would be at that time." Brunner Tr. 5/31/91 at 149.

Examples of Evidentiary Exhibits

The following exhibits were part of this court's record. This court finds the following evidence to be relevant and persuasive in its decision to deny decertification.

63. Bond representatives were given answer sheets to most frequently asked questions. For example, Exhibit 31149 is entitled "Who is ACC?" The first two answers: "1. Lincoln Savings parent. 2. Phoneix [sic] based, diversified financial holding company with $5 billion in assets."

64. Exhibit 30855 is entitled "Exactly Who is ACC?" Again, the first two answers: "1. Lincoln Savings Parent Company, 2. Phoneix [sic] based, diversified financial holding company with 5 BILLION IN ASSETS!"

65. Exhibit III-70015 is entitled "How to overcome the questions: Are these Bonds Insured? and What's the Risk?"

66. The record contains material such as a "Bond Seminar Script," "Bond Selling Tips," and a slide presentation outline which similarly emphasized the strength of ACC's assets and described its posture as parent of Lincoln Savings. These materials were used prepare bond representatives. *E.g.* Figeira Tr. 1/9/91 at 26, 154; Bovay Tr. 9/13/91 at 111–113; Todd L. Storkensen Tr. 1/25/91 at 27–28, 48–50; Dak Tr. 3/13/91 at 104; Lagerstrom Tr. 1/23/91 at 185.

### IV.

The court holds that the Plaintiff class has an overriding common interest in attempting to prove that Defendants devised and implemented, or aided and abetted, a scheme which was the source of representations made to them. Members of the class are similarly situated with respect to Defendants' alleged conduct. The evidence confirms that class treatment of Plaintiffs' claims is superior to any other available method for the fair and efficient adjudication of these claims.

In denying class decertification, the court does not implicate the ultimate determination of any Defendant's culpability. This holding does not enhance the Defendants' liability because it in no way relieves Plaintiffs of their burden to establish the requisites, including scienter, under the securities or racketeering statutes.

Accordingly, IT IS HEREBY ORDERED that Defendants' Motions for Class Decertification based on the "canned sales pitch theory," the "fraud on the regulatory process doctrine," the *Roble* claims, and with respect to the ACC ESOP, are DENIED. IT IS FURTHER ORDERED that claims based on Section 10(b) of the Securities Exchange Act of 1934, Sections 11 and 12 of the Securities Act of 1933, RICO, and the state claims set forth in *Roble*, are certified for class treatment consistent with this opinion.