Clarence MARTIN, et al., Plaintiffs,

v.

DAHLBERG, INC., et al., Defendants.

No. C 93 2850–FMS.

United States District Court,
N.D. California.

April 7, 1994.

**210**

Daniel C. Girard, Steven E. Fineman, Lieff Cabraser & Heimann, San Francisco, CA, Douglas D. Shaffer, Santa Monica, CA, for plaintiff Robert Vusich.

Daniel C. Girard, Steven E. Fineman, Kristine E. Bailey, Lieff Cabraser & Heimann, San Francisco, CA, for plaintiffs Clarence Martin, Adrian Springer and Alfred Dixon.

Dana K. Welch, O'Melveny & Myers, San Francisco, CA, for defendants Dahlberg, Inc., a MN Corp., Kenneth H. Dahlberg, K. Jeffrey Dahlberg, Eric D. Estergren, John N. Beall, Benjamin W. Wofford.

## ORDER DENYING PLAINTIFFS' MOTION FOR CLASS CERTIFICATION; SETTING STATUS CONFERENCE

FERN M. SMITH, District Judge.

### Introduction

The individual and representative plaintiffs ("Plaintiffs") seek certification, under Federal Rule of Civil Procedure 23(a)(1)–(4) and 23(b)(3), of the following plaintiff class (the "Class"):

> All persons who purchased between May 1, 1989 and May 1, 1993 (the "Class Period") Miracle–Ear hearing aids, including but not limited to those equipped with the "Clarifier," represented by Dahlberg, Inc. ("Dahlberg") and its authorized agents to reduce background noise and allow per-

sons with hearing loss to distinguish and understand speech in noisy or group situations. (Consolidated Amended Class Action Complaint ["Compl."], ¶ 24.)

In their reply brief, plaintiffs have also proposed a subclass to be defined as follows:

> All persons who purchased Miracle–Ear hearing aids **equipped with the Clarifier** between May 1, 1989 and May 1, 1993.

The claims of the class arise out of an allegedly common course of fraudulent conduct, characterized by allegedly uniform misrepresentations and omissions to class members that the Miracle–Ear hearing aid equipped with the Clarifier circuit ("Clarifier")[1] "automatically reduces background noise" and "boosts speech" so that one can better hear and understand speech in noisy or group situations. The plaintiff class seeks recovery on several legal theories including Civil RICO and various supplemental common law claims sounding in fraud, negligent misrepresentation and negligence. The Class also seeks recovery under sections 17200, *et seq.* and 17500, *et seq.* of the California Business and Professions Code (Compl., ¶¶ 102–107).

While there are substantial common questions of law and fact which could be resolved collectively, class certification is not warranted because there are individual questions of fact concerning reliance and causation which predominate. Plaintiffs' motion for class certification is therefore DENIED.

### Background

**A. Advertisement of Miracle–Ear Clarifier Generated Directly by Dahlberg**

The allegations of the complaint, taken together with the supplementary evidentiary submissions of the parties, form the basis of the Court's analysis of plaintiffs' class certification motion.

During the class period, Dahlberg manufactured and marketed hearing aids, including the Miracle–Clarifier, through approximately 1000 franchised and company-owned Miracle–Ear retail stores located in all fifty

---

1. The "Clarifier" is to be distinguished from other Miracle–Ear hearing aids not equipped with the Clarifier circuit.

states. Miracle–Ear hearing aids were sold in the retail locations and in customers' homes.

Dahlberg promoted Miracle–Ear products, including the Miracle–Ear Clarifier, through an advertising program targeted to the over–55 age group and which used national and regional print publications, television, radio and direct mail and package inserts. Although the precise language used in the advertisements varies, the essential message conveyed concerning the qualities and performance of the Miracle–Ear Clarifier was the same throughout the class period, i.e., that the Miracle–Ear Clarifier reduces background noise, or that Miracle–Ear Clarifier boosts speech. Dahlberg advertised other hearing aids during the class period, but did not represent that those products could reduce background noise.

Some of Dahlberg's advertisements were "direct response" advertisements which provided potential customers with a business reply card or toll-free telephone number with which the potential customer could contact the company. After a potential customer contacted Dahlberg, the company typically sold the customer's name and telephone number, or "lead," to a local franchisee. The record does not indicate what percentage of Dahlberg's leads were generated by direct response advertising that contained representations concerning the Clarifier.

### B. Representations Generated By Retail Centers and Franchisees

During some or all of the class period, Dahlberg's franchise agreements required franchisees to purchase from Dahlberg sales leads which were generated by Dahlberg's direct response advertising program. As a result, plaintiffs allege that after being introduced to Miracle–Ear through Dahlberg's advertising, customers typically dealt with their local Miracle–Ear center.

Miracle–Ear retail stores were required by Dahlberg to operate under certain uniform "standards and procedures." Although no nationally prepared script dictated what a retailer or franchisee must say when he or she sold hearing aids, Dahlberg did design advertisements and promotional materials for use by its franchisees, and each franchisee agreed that its advertising "shall conform to the standards and requirements established by Dahlberg." The record does not indicate, however, what these "standards and requirements" were, nor does it indicate the substance of the advertising material Dahlberg designed for its franchisees. Dahlberg also required pre-approval of all materials prepared by franchisees utilizing any trademark name, symbol, product or slogan but, again, the record does not indicate what criteria Dahlberg used in reviewing such materials.

Plaintiffs allege that some of Dahlberg's Clarifier advertising was repeated orally by Miracle–Ear salespeople when promoting and selling the Clarifier in Miracle–Ear retail centers and in customers' homes. The declarations of the four salespeople of "hearing consultants" who sold Miracle–Ear hearing aids to the four named representative plaintiffs, however, indicate that each salesperson made somewhat different representations concerning the Clarifier and its capabilities.

### C. Hearing Consultants and Hearing Tests

Plaintiffs allege that franchisees employ salespeople called "hearing consultants" who purport to perform "complete hearing evaluations" and "fit hearing aids" and who sell Miracle–Ear products to the public in the store and in their homes. Dahlberg represented in its promotional materials that Miracle–Ear centers provide "professional service by fully-trained personnel," and that customers can be "assured" of "knowledgeable service." Plaintiffs allege, however, that the hearing consultants typically have no special training or expertise in the treatment of hearing loss. Plaintiffs also allege that the hearing consultants are typically commissioned salespeople who are expected to meet sales quotas established by their employer-franchisee and who engage in "hard-sell" sales tactics.

Plaintiffs further allege that Dahlberg and its agents advertised and provided "free" hearing examinations to all potential customers for the purpose of inducing customers to visit a Miracle–Ear retail store. After the

hearing test (performed by the "hearing consultant"), and after securing the customer's agreement to purchase a Miracle–Ear hearing aid, the hearing consultants obtained the customer's signature on a purchase agreement or other document which waived the protections of a federal law requiring that hearing aid dealers inform customers that they should see a doctor before purchasing a hearing aid and that a person be given proper medical evaluation before being sold a hearing aid.

## D. Performance of the Miracle–Ear Clarifier

Plaintiffs allege that, contrary to Dahlberg's advertising, the Miracle–Ear Clarifier does not automatically reduce background noise while allowing the user of the product to better hear and understand speech; does not help or improve one's ability to hear and understand conversation in noisy or group situations; and is not based on technology unique to and available only from Miracle–Ear. Plaintiffs further allege that Dahlberg failed to disclose that there is no credible scientific or industry data to support representations touting the unique benefits of the Miracle–Ear Clarifier.

In support of these allegations, plaintiffs note that both the Federal Trade Commission ("FTC") and the Food and Drug Administration ("FDA") have publicly denounced Miracle–Ear advertising, including Dahlberg's representations concerning the Clarifier. In April 1993, the FTC notified Dahlberg that it was violating a 1976 Consent Decree prohibiting Dahlberg from claiming, *inter alia,* that its hearing aids "will enable persons with hearing loss to distinguish or understand speech sounds in noisy situations." Also in April, 1993, the FDA informed Dahlberg that its claims concerning the Clarifier were misleading and not supported by clinical data. At the request of the FDA, Dahlberg withdrew hearing aid advertising containing noise reduction claims.

Defendants claim that Dahlberg hearing aids equipped with the Clarifier help many users hear better in noisy environments. Defendants also note that a variety of individualized factors may cause the Clarifier not to work as represented. Ultimately, however, defendants do not offer evidence to challenge the *conclusions* of the FDA and FTC that representations concerning the Clarifier's effectiveness at reducing background noise are misleading.

## E. The Representative Plaintiffs

### 1. Adrian Springer

Mr. Springer is 78 years old. He first purchased hearing aids from Miracle–Ear in 1985, three years before the Clarifier circuitry was even on the market, in response to an advertisement that did not relate to the Clarifier option. In 1990, Mr. Springer returned to Miracle–Ear to purchase aids equipped with the Clarifier. He visited a Miracle–Ear retail center in Sunnyvale, California where Clyde Bo Nixon fitted Mr. Springer with Clarifier aids.

Springer testified that several things influenced his purchasing decision, including advertising, an article he saw in *Reader's Digest,* and the representations of Mr. Nixon. The advertising impressed him because he thought the Clarifier circuit would help his problem with background noise and because it was a smaller unit and more electronically sophisticated than his old hearing aids.

Mr. Springer also testified that Nixon informed him that the Clarifier could reduce background noise and allow him to better hear and understand speech in the presence of background noise. Nixon has declared that he told Springer that the hearing aids would not eliminate background noise, only that the Clarifier option *may possibly* help a person who has difficulty hearing in noisy situations. In support of his version of the transaction, Nixon notes that he typically reads to his customers from product literature, which states "although Clarifier II makes listening in noisy environments easier, it will not eliminate background noise." (Nixon Decl., ¶ 6, Ex. 2.)

### 2. Clarence Martin

Clarence Martin, 77 years of age, purchased two Miracle–Ear Clarifiers in July 1991. While shopping at a Montgomery Ward department store, he saw a sign adver-

tising free hearing tests at the Miracle–Ear outlet in the store. Prior to entering the store, Martin had seen Miracle–Ear advertisements. Plaintiffs' memorandum in support of class certification suggests that Martin had seen print advertisements concerning "background noise elimination." Plaintiff's MPA ISO Class Certification, p. 9. The deposition excerpts submitted in support of this contention, however, are either not included as exhibits or simply state that while Martin had seen Miracle–Ear advertisements, he could remember nothing about their content. Martin was also unable to remember whether the advertisements he saw influenced his decision to purchase the Clarifier-equipped hearing aids.

While at the Miracle–Ear outlet, Martin was attended by Rebecca Cervantes. Martin recalls Cervantes telling him that the Miracle–Ear Clarifier would cut out background noise. Cervantes declares that she is "careful to say that nothing completely eliminates background noise, but this *may* make it a little easier to hear amid noise. Cervantes Decl., ¶ 7.

### 3. Alfred Dixon

Alfred Dixon, 77, did not purchase a Clarifier equipped hearing aid. He saw Miracle–Ear's television advertisements stating that the Clarifier would stop background noise. He telephoned the toll-free number identified in the commercials and was referred to a local authorized Miracle–Ear center.

Dixon met with Kenneth Fraser. Dixon told Fraser that he wanted a hearing aid that would stop the background noise which made it difficult for him to communicate in the dining room of his retirement home. Fraser declares that he recommended Dixon purchase two hearing aids because use of only one aid would create difficulties in his hearing. Dixon, according to Fraser, declined to accept this advice.

Dixon and Fraser disagree about what Fraser said to Dixon about the hearing aid. Dixon states that Fraser told him that it would stop background noise, while Fraser claims that he never told Dixon that the aid he purchased had the Clarifier option or that

it would reduce or eliminate background noise.

### 4. Robert Vusich

Mr. Vusich, like Mr. Dixon, did not purchase hearing aids equipped with Clarifiers. After seeing and hearing Miracle–Ear television commercials explaining that the Clarifier would enable one to hear better in noisy situations, Vusich, in 1991, telephoned the toll-free number to contact the company. In January 1993, Paul Tripoli contacted Mrs. Vusich and scheduled a home hearing aid test for Mr. Vusich. According to Mr. Vusich, Tripoli represented that the hearing aid Mr. Vusich was contemplating purchasing would reduce background noise and help him to hear and understand speech in group situations. Tripoli asserts that the subject of background noise never arose and that there is no notation in Mr. Vusich's chart reflecting a concern about background noise.

### Discussion

### A. Evidentiary Burden And Standard For Class Certification

 The parties disagree about the appropriate burdens the Court may apply in evaluating this motion. The burden of proving that a class is appropriate rests with the proponent of the class action. *Shields v. Smith,* [1992 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 97,001 at 94,376 (N.D.Cal. 1992). The party seeking to maintain the action as a class suit must, therefore, establish a *prima facie* showing of each of the four certification prerequisites, *i.e.* numerosity, commonality, typicality and adequacy. The proponent of the class must also demonstrate a *prima facie* case that appropriate grounds for a class action exist, *i.e.* common questions predominate and, on balance, that a class action is superior to other methods for adjudicating the controversy. *Blackie v. Barrack,* 524 F.2d 891, 901 (9th Cir.1975), *cert. denied,* 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976); *Taylor v. Safeway Stores, Inc.,* 524 F.2d 263 (10th Cir.1975); Fed.R.Civ.P. 23(a) & (b)(3).

 Because the early resolution of the class certification question requires some degree of speculation, however, all that is re-

quired is that the Court form a "reasonable judgment" on each certification requirement. In forming this judgment, the Court may properly consider both the allegations of the class action complaint *and* the supplemental evidentiary submissions of the parties. *Blackie v. Barrack,* 524 F.2d at 900, 901 n. 17.

## B. Individual Issues of Reliance Predominate; therefore, the Court Will Not Certify the Class

■ To proceed with their class suit, plaintiffs must demonstrate that there are "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). "The fact that there is some factual variation among the class grievances will not defeat a class action ... A common nucleus of operative fact is usually enough to satisfy the commonality requirement...." *Rosario v. Livaditis,* 963 F.2d 1013, 1017–18 (7th Cir.1992), *cert. denied,* ── U.S. ──, 113 S.Ct. 972, 122 L.Ed.2d 127 (1993). It is important to bear in mind, however, that the core purposes of proceeding with a class suit will only be advanced if the common issues of law or fact are issues central to the case. *See Stott v. Haworth,* 916 F.2d 134, 145 (4th Cir.1990) ("certification is proper only when a determinative critical issue overshadows all other issues.") In this regard, it is clear that if a class proponent is able to persuade the Court that the common issues predominate as required under Rule 23(b)(3), the Court will have no trouble finding the commonality prerequisite satisfied.

Here, the parties disagree sharply over the commonality and predominance questions. Plaintiffs contend that the complaint and the evidence support plaintiffs' allegations that defendants engaged in a common course of fraudulent conduct consisting of various coordinated misrepresentations about the capabilities and qualities of the Dahlberg Miracle–Ear Clarifier and that this common issue predominates. From the common course of fraudulent conduct, plaintiffs assert, the Court may infer the element of reliance. Defendants dispute the contention that they engaged in a common course of conduct by contending that a variety of representations, both oral and written, were made to putative class members. Defendants further claim that individual questions predominate with respect to reliance, causation and damages.

### 1. Plaintiffs' RICO Claims

■ In order to establish a violation under 18 U.S.C. § 1962 of RICO, a plaintiff must prove that (1) a person, (2) through a pattern of racketeering activity (predicate acts), directly or indirectly invested in or maintained an interest in, or participated in (3) an enterprise; (4) the activities of which affected interstate commerce. *Heastie v. Community Bank of Greater Peoria,* 125 F.R.D. 669, 674 (N.D.Ill.1989). Plaintiffs derive from this statutory definition the conclusion that " 'because many of the elements of RICO actions focus on the conduct of the defendants,' " significant common issues of fact and law are present. Plaintiff's Opening Brief at 15, quoting *McMahon Books, Inc. v. Willow Grove Associates,* 108 F.R.D. 32, 38 (E.D.Pa.1985). This conclusory assertion cannot substitute for careful element-by-element analysis of the commonality of the issues presented by plaintiffs' claims.

Several elements of plaintiffs' RICO claim are common. The answer to the question whether defendants are "persons" within the meaning of 18 U.S.C. § 1962 will be the same vis-a-vis all class members. While this is a common question, it does not predominate.

■ In support of their allegation that a "pattern of racketeering activity" or predicate acts have occurred, plaintiffs allege one common fraudulent scheme employing acts of mail, wire, radio, and television fraud. The elements of mail, wire, radio and/or television fraud are (1) a scheme or artifice to defraud; (2) the use of the United States mails, wires, radio and/or television (or causing the use thereof) in furtherance of the scheme; and (3) a specific intent to deceive or defraud. 18 U.S.C. § 1341, 1343; *Schreiber Distributing Co. v. Serv–Well Furniture Co.,* 806 F.2d 1393, 1399–1400 (9th Cir.1986). As to each of these three elements, common evidence will show whether defendants engaged in a "pattern of racketeering activity." *See e.g., In re United Energy Corp.,* 122 F.R.D. 251, 255 (C.D.Cal.1988); *Heastie,* 125 F.R.D. at 674.

While this issue is common to each of plaintiffs' claims for relief, it does not necessarily predominate.

The same can be said for the "enterprise" element. Determination of this issue will involve examination of defendants' course of conduct to establish that a RICO "enterprise" exists and that defendants participated in it. *McMahon Books*, 108 F.R.D. at 39; *Heastie*, 125 F.R.D. at 675.

While the preceding elements are common to each individual plaintiffs' RICO claims, recovery under the statute still requires proof of the element of reliance. 18 U.S.C. § 1964(c); *Brandenburg v. Seidel*, 859 F.2d 1179, 1188, n. 10 (4th Cir.1988) *Daley's Dump Truck Service v. Kiewit Pacific Co.*, 759 F.Supp. 1498, 1503 (W.D.Wash.1991), *aff'd sub nom*, 976 F.2d 1303 (9th Cir.1992), *cert. denied*, — U.S. —, 113 S.Ct. 1644, 123 L.Ed.2d 266 (1993).

■ Here, plaintiffs cannot show common questions. Furthermore, the individualized questions of reliance presented by plaintiffs' RICO claims predominate so as to preclude wholesale certification of the class with respect to the RICO claims. The present record suggests that a myriad of factors may have influenced the decisions of putative class members to purchase Miracle–Ear hearing aids. Even among the named plaintiffs, there is a need for fact-specific and individualized examination of the reliance issue. Some putative class members like Mr. Springer, may have been influenced by advertisements totally unrelated to the Clarifier and claims of reduced background noise. Others, like Mr. Martin, may have seen the Clarifier ads, but are uncertain as to what effect those commercials had on their purchasing decision. Still others, like Messrs. Dixon and Vusich claim to be victims of Dahlberg's "bait and switch" tactic of luring customers in with claims of reduced background noise associated with the Clarifier, and then selling them non-Clarifier equipped hearing aids.

To address these discrepancies, plaintiffs suggest the formation of a subclass consisting of purchasers of Clarifier equipped hearing aids. While this may serve to eliminate some of the variation between class members, substantial differences are likely to remain. In addition to the distinctions the Court can draw between the named plaintiffs, other reliance questions are likely to arise. While Dahlberg engaged in a national advertising campaign which included various claims about the Miracle–Ear Clarifier's ability to "reduce background noise" and "boost speech," these advertisements were not the only message consumers shopping for hearing aids were likely to receive from Dahlberg and others involved in marketing and promoting Dahlberg products. Dahlberg itself promoted other hearing aid products that do not use the Clarifier circuit. Second, potential hearing aid purchasers might have learned about Dahlberg products on a simple walk-in basis, that is, by entering a retail center prior to receiving advertising or by being contacted by a Dahlberg agent or franchisee. Some of these customers may have been lured in by the promise of a free hearing test, others by brand identification, and still others by recollection of promises made in Dahlberg's advertisements concerning the Clarifier. Each case is different. Others may have come to purchase Miracle–Ear hearing aids as a result of word of mouth and other factors unrelated to Dahlberg's fraudulent course of conduct. In all likelihood, many individuals who purchased Miracle–Ear hearing aids did so for a variety of factors, any one of which, or combination thereof, actually may have caused the customer to make the purchase.

The critical point is that these questions raise substantial questions about the ability of the Court to resolve reliance questions on a class-wide basis. The diversity of sources of information, the diversity of messages generated by those interested in selling Dahlberg products, and the potential for differing reliance on varied information weigh strongly against class adjudication of the critical issues of reliance.

While plaintiffs have presented a list of authorities supporting certification of RICO claims in other contexts, none of the cases cited amply address the concern that wholesale certification of *this* class will help resolve the predominate issues of reliance. In particular, the lack of evidence of the existence

of a fixed set of written materials or even a somewhat standardized sales pitch prevents this Court from engaging in the kind of analysis which allowed the courts in cases such as *Heastie v. Community Bank of Greater Peoria*, 125 F.R.D. 669, *McMahon Books, Inc. v. William Grove Associates*, 108 F.R.D. 32, *Weiss v. Winner's Circle of Chicago, Inc., et al.*, 1992 WL 220686, 1992 U.S. Dist. LEXIS 13288 (N.D.Ill. Sept. 3, 1992), *In re United Energy Corp.*, 122 F.R.D. 251, *In re American Continental Corp./Lincoln Savings & Loan Securities Litigation*, 140 F.R.D. 425 (D.Ariz.1992) ("*ACC/Lincoln*"), and other cases to find that individual issues of reliance did not predominate.

For instance, in both *McMahon* and *Heastie*, each plaintiff was exposed to *uniform* written misrepresentations. In *McMahon*, the court held that common issues of fact predominated because each plaintiff "by definition" received a standardized Confirmation of Business Terms that contained the alleged misrepresentations. 108 F.R.D. at 33, 38, n. 3. In *Heastie*, common questions predominated because there was evidence that each plaintiff had relied on the misrepresentations, because each plaintiff had signed the loan document that was at the heart of the RICO scheme. 125 F.R.D. at 673–74.

At oral argument, plaintiffs' counsel referred to the *ACC/Lincoln* case. There, the court found that "[a]lthough the representations made to the bond purchasers in this case were not identical, they were sufficiently uniform to warrant class treatment." 140 F.R.D. at 430. That case involved the sale of debentures to individual investors who relied on oral representations of bond salespersons and representatives who, in turn, had received fraudulent information from defendants which was material to the value of the bonds. In deciding to certify the class despite the absence of strict uniformity in the sales pitch, the court referred to a record which showed that ACC/Lincoln "repeatedly emphasized predominant interrelated themes, which originated from management ..." 140 F.R.D. at 431. Plaintiffs presented testimony of both bond representatives and

purchasers alike which revealed a "centrally orchestrated strategy." 140 F.R.D. at 430.

The important distinction to be made between *ACC/Lincoln* and this case is that plaintiffs in *ACC/Lincoln* all relied on the misrepresentations of bond salespersons who differed slightly in their presentation of the same misleading information. In contrast, the purchasers of Dahlberg's Miracle Ear may have relied on advertisements which may or may not have contained references to the Clarifier, or oral representations of salespersons who may or may not have mentioned the Clarifier or its capabilities. Therefore, while the court in *ACC/Lincoln* could presume that any sales of the ACC/Lincoln debentures would involve some misrepresentation directly material to the value of the bonds, there is no similar basis for this Court to presume that each putative class member received any misleading information about the Clarifier. The disparities between the experiences of the representative plaintiffs and the submitted declarations of their respective salespersons demonstrate that this is not a record upon which a showing of reliance can be made on a class-wide basis.

The instant case is more akin to *Strain v. Nutri/System, Inc.*, 1990 WL 209325, 1990 U.S. Dist. LEXIS 17031 (E.D.Pa., Dec. 12, 1990) and *Rosenstein v. CPC International, Inc.*, 1991 WL 1783, 1991 U.S. Dist. LEXIS 200 (E.D.Pa. Jan. 8, 1991). *Strain* involved a national corporate advertising campaign and direct customer contact primarily with licensees and franchisees of the main corporate entity. The court rejected certification of a RICO consumer fraud class because "satisfaction with the reliance issue ... requires each class member to narrate a story which includes individualized proof of which advertisements he saw and whether they indeed enrolled in reliance on those advertisements," or whether the class member enrolled because of oral representations made in the course of an interview and subsequent sign-up. *Id.* 1990 WL 209325, at *6, 1990 U.S. Dist. LEXIS 17031 at *20.

Similarly, in *Rosenstein*, 1991 WL 1783, at *1, 1991 U.S. Dist. LEXIS 200 at *2–3, the putative class asserted that the manufacturer marketed Mazola corn oil and margarine under the fraudulent claim that an individual's

consumption of Mazola would reduce his or her existing serum cholesterol level, and, therefore, was able to market Mazola at higher prices than other cooking oils and margarines. The court denied class certification because an individual fact-specific analysis was required for each class member:

> [W]hether they saw the advertisements; whether they believed the advertisements; whether they would have purchased Mazola notwithstanding the advertisements; whether they were concerned about their serum cholesterol levels; whether they interpreted the advertisements similarly to named plaintiffs; and/or whether they purchased Mazola for reasons unrelated to the cholesterol lowering claims. *Id.* [1991 WL 1783, at *3] at *9.

Given the present record before this Court, this case similarly presents highly individualized questions of reliance which predominate in these proceedings.

## 2. Common Law Fraud and Negligent Misrepresentation Claims

■ The common law claims of fraud and negligent misrepresentation also require proof of reliance. *Mirkin v. Wasserman,* 5 Cal.4th 1082, 23 Cal.Rptr.2d 101, 105–06, 858 P.2d 568, 572–73 (1993). The same individualized questions of reliance discussed above preclude certification of plaintiffs' class for purposes of resolving these claims.

■ Plaintiffs direct the Court's attention to case law suggesting that in some consumer fraud class actions, reliance may be inferred on a class-wide basis. *See e.g., Vasquez v. Superior Court,* 4 Cal.3d 800, 94 Cal.Rptr. 796, 484 P.2d 964 (1971) and *Occidental Land, Inc. v. Superior Court,* 18 Cal.3d 355, 134 Cal.Rptr. 388, 556 P.2d 750 (1976). These cases do not control here since the plaintiffs in both *Vasquez* and *Occidental Land* specifically pled that the defendants had made *identical* representations to each class member. Accordingly, these decisions do not support an argument for presuming reliance where some guidelines for salespersons may have existed, but where actual representations varied.

More on point is *Osborne v. Subaru of America, Inc.,* 198 Cal.App.3d 646, 243 Cal.

Rptr. 815, 823–24 (1988), in which the Court of Appeal declined to apply a class-wide presumption of reliance to a claim of negligent misrepresentation based on the defendants' national advertising campaign. *Vasquez* was inapplicable there because deposition testimony revealed that some of the plaintiffs had not seen the allegedly misleading advertising. "There was no basis to draw an inference of class-wide reliance," the court concluded, "without a showing that representations were made uniformly to all members of the class." *Id.* 243 Cal.Rptr. at 824.

## C. The Court Will Not Certify the Class for Adjudication of Remaining State Law Claims

### 1. Individual Questions Predominate for the Negligence Claim

■ The elements of a negligence claim are: (1) defendant's legal duty of care toward plaintiff; (2) breach of that duty; (3) injury proximately caused by that duty; and (4) damages to plaintiff. *U.S. Liability Ins. Co. v. Haidinger–Hayes, Inc.,* 1 Cal.3d 586, 83 Cal.Rptr. 418, 422, 463 P.2d 770, 774 (1970). While it is true that individual issues as to injury and causation alone do not necessarily defeat class certification, *see In re United Energy Corp.,* 122 F.R.D. at 256, plaintiffs' negligence claim, nevertheless, is still not suitable for class treatment. The question of whether and to what degree defendants owed to plaintiffs a duty of care requires individualized inquiry. As noted above, putative class members may have purchased their Miracle–Ear hearing aids based on representations contained in the national print, radio and television advertising. Others may have come to Dahlberg by word of mouth or on a walk-in basis. Depending on which category a potential class member falls into, Dahlberg's duties to that individual may vary. Accordingly, common questions do not predominate on plaintiffs' negligence claims.

### 2. Common Questions Predominate On Consumer Protection Claims, But Court Lacks Jurisdiction To Hear Them.

■ Defendants oppose certification of plaintiffs' class claims under Cal.Bus. & Prof.

Code §§ 17200 *et seq.* (unfair business practice) and 17500 *et seq.* (false advertising) on grounds that individual questions of law predominate since the members of this nationwide class are citizens of states with substantially different consumer protection statutes. What defendants have failed to show, however, is that the laws of each individual state will apply.

In order to avoid the automatic application of California law to a nationwide class, defendants have the "substantial burden" of showing that (1) a "true conflict exists" among the laws of the various states; that (2) "each state has an interest in applying its own law," and (3) if each state law has an interest, which state interest will be most impaired if its law is not applied. *Roberts v. Heim,* 670 F.Supp. 1466, 1493 (N.D.Cal.1987), *rev'd in part,* 857 F.2d 646 (9th Cir.1988), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 561, 107 L.Ed.2d 556 (1990).

■ Defendants have shown that true conflict exists among the various consumer protection laws of the various states; however, they have not shown that any state other than California has an interest in applying its own laws, nor have defendants attempted to meet their burden of establishing that the application of California law would impair the interests of any foreign state. Because defendants have not met their burden under California conflicts of law analysis, California law should be applied to the nationwide class.

■ To state a cause of action under Sections 17200, *et seq.* and 17500, *et seq.,* plaintiffs need only show that " 'members of the public are likely to be deceived.' ... Allegations of actual deception, reasonable reliance, and damage are unnecessary." *Committee on Children's T.V., Inc. v. General Foods Corp.,* 35 Cal.3d 197, 197 Cal.Rptr. 783, 791, 673 P.2d 660, 668 (1983) (citations omitted). This Court may also order restitution "without individualized proof of deception, reliance, and injury" if necessary to prevent the unfair practice. *Id.,* 197 Cal. Rptr. at 792, 673 P.2d at 668. As a result, individual questions of reliance do *not* predominate with respect to plaintiffs' seventh and eighth claims for relief.

■ The Court will not certify a class based solely on these state law claims, however, because the only basis for federal jurisdiction in this action, the RICO claims, are not appropriate for class treatment. At oral argument, plaintiffs' counsel suggested that the Court could certify a class for purposes of adjudicating the state-law claims under its supplemental jurisdiction pursuant to title 28 U.S.C. section 1367. Presumably, the Court has original jurisdiction over the individual plaintiffs' RICO claims; however, even if the Court were to find that class-wide state law claims form part of the same "case or controversy" as the individual plaintiffs' RICO claims, the assertion of federal jurisdiction in this case is not proper. 28 U.S.C. § 1367(a).

Section 1367(c)(2) provides that the Court may decline to exercise supplemental jurisdiction over a claim if "the claim substantially predominates over the claim or claims over which the district court has original jurisdiction." The RICO claims of the four individual plaintiffs are insignificant compared with the class-wide relief potentially available to plaintiffs under the consumer protection laws. This is precisely the type of case where the Court should decline to extend federal judicial power.

### Conclusion

While plaintiffs have demonstrated some of the prerequisites for class certification, individual issues of reliance predominate with respect to plaintiffs' RICO (Claims One Two and Three), fraud (Fourth Claim), and negligent misrepresentation (Fifth Claim) claims. Individual issues also predominate with respect to plaintiffs' negligence (Sixth Claim) claim. The Court also declines to exercise jurisdiction over plaintiffs' statutory causes of action under the California Business and Professions Code (Claims Seven and Eight). Accordingly, plaintiffs' motion for class certification is DENIED. A status conference is scheduled.

SO ORDERED.