**JOINT EQUITY COMMITTEE OF IN-VESTORS OF REAL ESTATE PART-NERS, INC., et al., Plaintiffs,**

v.

**COLDWELL BANKER REAL ESTATE CORPORATION, et al., Defendants.**

**No. SACV 10–401 AG (MLGx).**

United States District Court, C.D. California.

March 26, 2012.

Howard Scott Leviant, Ira R. Spiro, J. Mark Moore, Spiro Moore LLP, Michael R. Newhouse, Ruth L. Seroussi, Suzanne M. Henry, Newhouse Seroussi Attorneys PC, Los Angeles, CA, for Plaintiffs.

Kevin James Minnick, Peter Bradley Morrison, Virginia F. Milstead, Skadden Arps Slate Meagher & Flom LLP, Los Angeles, CA, for Defendant.

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND DENYING DEFENDANTS' MOTION TO STRIKE

ANDREW J. GUILFORD, District Judge.

Plaintiffs Bradley B. Larsen, et al. ("Plaintiffs") seek to represent a class of investors who lost money in a fraudulent real estate securities scheme. Before the Court is Plaintiffs' Motion for Class Certification ("Motion"). Also before the Court is the Motion of Defendants Coldwell Banker Real Estate Corporation and Coldwell Banker Real Estate LLC (together, "Coldwell," "Coldwell Banker," or "Defendants") to "Strike or Disregard the 132 Putative Class Member Declarations" ("Motion to Strike or Disregard") supporting Plaintiffs' Motion. After considering the arguments and papers submitted, the Motion to Strike or Disregard is DENIED and the Motion for Class Certification is GRANTED in part and DENIED in part.

### BACKGROUND

This securities fraud class action arises from the wrongdoing of a company called Real Estate Partners ("REP"). The thrust of Plaintiffs' case is that Coldwell was aware of REP's fraudulent scheme and either aided it or failed to stop it. A brief summary of the scheme and the somewhat complex relationship between REP and Coldwell frames the issues discussed in this Order.

From 2003 to 2006, REP sold unregistered securities in seven real estate investment funds (the "Investment Funds"). Around 1600 investors invested over $50 million in the Investment Funds. In September 2007, the United States Securities and Exchange Commission ("SEC") sued REP, the Investment Funds, and REP's principals for violat-

ing federal securities laws. *See SEC v. Real Estate Partners, et al.,* Case No. 07–1022 AG (MLGx). Coldwell was not named in the SEC's lawsuit against REP.

REP and the Investment Funds declared bankruptcy in October 2007. Despite a Final Judgment in the SEC action ordering disgorgement, it eventually became clear to Plaintiffs that the assets of REP, the Investment Funds, and REP's principals would be insufficient to cover the investors' losses. As a result, and with the alleged discovery of Coldwell's purported involvement in REP's scheme, Plaintiffs filed this lawsuit in April 2010. (Plaintiffs' Reply to Defendants' Motion to Dismiss the First Amended Complaint at 25:5–7.)

Plaintiffs' Second Amended Complaint ("SAC") describes Coldwell's connection to REP. Plaintiffs allege that in 2000, REP bought a Coldwell franchise known as Coldwell Banker American Spectrum ("CB/AS"). (SAC ¶ 15.) Plaintiffs further allege that REP and CB/AS violated the terms of CB/AS's franchise agreement with Coldwell soon after the agreement was signed. (SAC ¶ 16.) Although Plaintiffs allege that Coldwell was aware (or should have been aware) of these violations, Coldwell did not disassociate itself from REP. (*Id.*)

In April 2003, Coldwell allegedly executed two franchise agreements with a real estate brokerage firm known as Orange Coast Commercial, Inc. ("OCC"). (SAC ¶ 18.) REP allegedly owned a 40.5% stake in OCC. (*Id.*) In mid–2003, OCC formally changed its name to Coldwell Banker Commercial REP ("CB/REP"). Plaintiffs allege that REP and CB/REP are alter egos. (*Id.* ¶ 19.)

Under its franchise agreements, CB/REP paid certain fees to Coldwell. Plaintiffs allege that these fees were paid, at least in part, with money from the class members' investments in the Investment Funds. (*Id.* ¶ 21.) Plaintiffs specifically allege that Coldwell "not only knew about CB/REP's Investment Funds, but agreed and conspired with REP to use the Coldwell Banker name to solicit the investments." (*Id.* ¶ 58.)

Coldwell disputes that it knew about REP's fraudulent scheme, let alone conspired with REP to defraud the putative class members. And while Plaintiffs allege that Coldwell profited from the fraud, they do not dispute that Coldwell received less than $90,000 from REP and CB/REP during the lifetime of the CB/REP franchise. (Opposition to Plaintiffs' Motion ("Opp'n") at 9:11–15.)

In September 2011, the Court granted in part and denied in part Defendants' Motion to Dismiss Plaintiffs' SAC. Plaintiffs' surviving claims against Coldwell are for (1) negligence, (2) fraud, (3) negligent misrepresentation, (4) false advertising under Cal. Bus. & Prof.Code § 17500, and (5) aiding and abetting.

Plaintiffs now ask the Court to certify a "nationwide" class consisting of "[a]ll persons and entities that paid money to invest in any of the REP Investment Funds...." (Notice of Motion at 2:9–14.) Excluded from the proposed class are Defendants, REP, CB/REP, CB/AS, OCC, class counsel, and other related people and entities.

### *LEGAL STANDARD*

Under Federal Rule of Civil Procedure 23(a),

> One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
>
> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

A class action may only be maintained if Rule 23(a) is satisfied and if one of the three subparts of Rule 23(b) is satisfied. Rule 23(b) provides:

> (1) prosecuting separate actions by or against individual class members would create a risk of:
>
> (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible

standards of conduct for the party opposing the class; or

(B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests;

(2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole; or

(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

■ "Rule 23 does not set forth a mere pleading standard." *Wal–Mart Stores, Inc. v. Dukes*, —— U.S. ——, 131 S.Ct. 2541, 2551, 180 L.Ed.2d 374 (2011). "A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Id.* "The party seeking class certification bears the burden of demonstrating that the requirements of Rules 23(a) and (b) are met." *Marlo v. U.P.S.*, 639 F.3d 942, 947 (9th Cir. 2011). A district court should certify a class only if the court "is satisfied, after a rigorous analysis," that the Rule 23 prerequisites have been met. *Id.* (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). If the court is not satisfied, then certification should be refused. *Falcon*, 457 U.S. at 161, 102 S.Ct. 2364. "Frequently that 'rigorous analysis' will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped." *Wal–Mart*, 131 S.Ct. at 2551 (citing *Falcon*, 457 U.S. at 161, 102 S.Ct. 2364).

## ANALYSIS

### 1. EVIDENTIARY ISSUES

Before turning to the question of certification, the Court first considers Defendants' Motion to Strike or Disregard the 132 putative class member declarations supporting Plaintiffs' Motion. The Court then addresses the parties' other evidentiary objections.

### 1.1 Defendants' Motion to Strike or Disregard Putative Class Member Declarations

As noted, Defendants request that the Court "strike or disregard" all 132 putative class member declarations supporting Plaintiffs' Motion. Defendants argue that these declarations should be stricken under Federal Rule of Evidence 602 because subsequent depositions of the declarants reveal that they "can no longer recall the relevant events." (Motion to Strike or Disregard at 1:21 (citing Fed.R.Evid. 602 (governing the need for personal knowledge)).) Defendants also assert that these "cookie-cutter declarations" (*Id.* at 3:20–21) should be stricken or disregarded under Federal Rule of Evidence 403 because they are inconsistent with the declarants' deposition testimony. As will be discussed more fully in Section 3.1.1, the declarations of these 132 putative class members are central to the certification issue because they serve as the primary support for Plaintiffs' contention—which Defendants vehemently dispute—that common issues predominate over individual issues in this case.

A little background puts these declarations and the Motion to Strike or Disregard in context. Plaintiffs submitted the 132 declarations—one each from the five named Plaintiffs and 127 from absent class members—primarily to establish (1) the uniformity of the misrepresentations allegedly made by REP and CB/REP representatives and (2)

the use of Coldwell's name to promote the Investment Funds. Each declaration is about two pages long and follows a nearly identical pattern. The declarants state that they were contacted by REP or CB/REP representatives soliciting investments in real estate securities and that these representatives claimed that the securities were affiliated with Coldwell in some manner. (*See, e.g.,* Dkt. No. 67, Exs. 1–65; 68 Exs. 66–127.) The declarants further state that they received a follow-up call from REP or CB/REP representatives as well as marketing materials related to the Investment Funds. Among other things, the declarants claim that they had never heard of CB/REP or REP before being contacted, but easily recognized the Coldwell Banker name when the REP or CB/REP representative mentioned it.

In August 2011, Defendants filed an ex parte application requesting leave to depose all 132 declarants. *See* Fed.R.Civ.P. 30(a)(2)(A)(i) (requiring parties wishing to conduct more than ten depositions to obtain leave of court). The Court granted Defendants leave to depose up to 18 declarants (of Defendants' choosing), reasoning that "inconsistencies in some of the declarations may call into question the accuracy of the declarations as a whole." (Dkt. No. 81 at 6.) Defendants filed the Motion to Strike or Disregard soon after deposing the 18 declarants.

Plaintiffs argue that the Motion to Strike or Disregard should be denied because (1) Defendants violated Local Rule 7–3; (2) Defendants brought the Motion to Strike or Disregard to circumvent the page restrictions of Local Rule 11–6; and (3) the declarations, like the deposition testimony, confirm critical facts about the sales pitches, written materials, and investors' reliance on the Coldwell name.

■ It's unclear based on the parties' conflicting narratives whether Defendants failed to comply with Local Rule 7–3. There is also no way of knowing whether Defendants brought the Motion to Strike or Disregard to circumvent Local Rule 11–6. As Defendants note, the practice of separately moving to *strike* evidence is "commonplace." (Reply at 24:16–21.)

But the practice of separately moving to *disregard* evidence is far less common. And Defendants' arguments supporting their Motion to Strike or Disregard closely parallel the arguments made in their Opposition to class certification. *Merriweather v. Southwest Research Institute*—a case cited by Defendants—is instructive. 2010 U.S. Dist. LEXIS 117297 (S.D.Ind. Nov. 3, 2010). In *Merriweather*, the plaintiffs submitted declarations that the defendants claimed to be flawed. *Id.* at *7. Instead of striking those declarations, the court simply considered them in the normal course and gave them the weight they deserved.

Here, there are insufficient grounds to strike or disregard the declarations under Rules 403 or 602. Instead, the Court will assess the strengths and weaknesses of the class member declarations—along with all other properly submitted evidence—as it considers whether the requirements of Rule 23 have been met.

Defendants' Motion to Strike or Disregard is DENIED.

## 1.2 Evidentiary Objections

To support its Opposition to Plaintiffs' Motion, Defendants raise several objections. Defendants' first objection simply reiterates arguments from its Motion to Strike or Disregard, and is OVERRULED for the reasons just given. Defendants' remaining Rule 403 objections are OVERRULED as well. The Court SUSTAINS Defendants' objection to Plaintiffs' Exhibits 40–51 under Federal Rule of Evidence 106. Because the Court did not rely on the financial data in Plaintiffs' Exhibit 60, it declines to rule on Defendants' objection to that exhibit.

Plaintiffs raise six evidentiary objections to two paragraphs from the declaration of Virginia Milstead supporting Defendants' Opposition. The objections are OVERRULED for purposes of this Motion. Plaintiffs' objections to the declarations supporting Defendants' Reply to the Motion to Strike or Disregard are also OVERRULED.

## 2. RULE 23(a) REQUIREMENTS

As noted, the Rule 23(a) requirements are numerosity, commonality, typicality, and adequacy. Fed.R.Civ.P. 23(a)(1)–(4).

### 2.1 Numerosity

■ Rule 23(a)(1) requires that a class be "so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "[I]mpracticability does not mean impossibility," but simply that joinder of all class members must be difficult or inconvenient. *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913 (9th Cir.1964) (*quoting Advertising Specialty Nat. Ass'n v. FTC*, 238 F.2d 108, 119 (1st Cir.1956) (internal quotation marks omitted)).

Here, both parties agree that the 1600–member putative class is sufficiently numerous. (Motion at 9:17–19.)

### 2.2 Commonality

"A class has sufficient commonality 'if there are questions of fact and law which are common to the class.'" *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir.1998) (*quoting* Fed.R.Civ.P. 23(a)(2)). "All questions of fact and law need not be common to satisfy this rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.*

There are numerous common questions of law and fact in this case, including whether Coldwell approved, enabled, or ratified CB/REP and REP's alleged fraud. The Court finds, and Defendants do not dispute, that Plaintiffs satisfy the commonality requirement.

### 2.3 Typicality

"The typicality prerequisite of Rule 23(a) is fulfilled if 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *Hanlon*, 150 F.3d at 1020 (*quoting* Fed.R.Civ.P. 23(a)(3)). "Representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Id.*

Here, Plaintiffs argue that "[they] suffered the same injury as fellow class members—namely, the loss of invested funds." (Motion at 9:28–10:1.) Plaintiffs further argue that their claims "arise from the same conduct and are based on the same theories" as the absent class members' claims. (Motion at 10:1–2.)

Defendants do not dispute the typicality of putative class members who invested in five of the seven Investment Funds. But in the final few paragraphs of their Opposition, Defendants argue that investors in the remaining two Investment Funds are not typical. (Opp'n at 25:4–23.) As explained more fully in Section 4, the Court finds that *all* putative class members satisfy the typicality requirement.

### 2.4 Adequacy

"The final hurdle interposed by Rule 23(a) is that the representative parties will fairly and adequately protect the interests of the class." *Hanlon*, 150 F.3d at 1020 (*quoting* Fed.R.Civ.P. 23(a)(4)). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Id.*

■ In a footnote on the penultimate page of their Opposition, Defendants claim that certain conflicts render Plaintiffs inadequate representatives. But Defendants' main contention—that "Plaintiffs are developing a factual record ... in a malpractice case against former REP advisors ... that undermines their claims here"—is insufficiently supported. Further, Plaintiffs have "demonstrated a willingness and vigor to prosecute the action." *In re Adobe Sys., Inc. Sec. Litig.*, 139 F.R.D. 150, 156 (N.D.Cal.1991).

The Court finds that Plaintiffs and their counsel are adequate to represent the class.

### 2.5 Conclusion

Plaintiffs satisfy the Rule 23(a) requirements of numerosity, commonality, typicality, and adequacy.

### 3. RULE 23(b)(3) REQUIREMENTS

Having met the Rule 23(a) prerequisites for class certification, Plaintiffs are entitled to proceed on a class basis only if they meet the requirements of one of the Rule 23(b) subsections. Here, Plaintiffs seek to proceed under Rule 23(b)(3). To qualify for certification under this subsection, a class must satisfy two conditions in addition to the Rule 23(a) prerequisites: "common questions must 'predominate over any questions affecting only individual members,' 'and class resolution must be superior to other available methods for the fair and efficient adjudication of claims.'" *Hanlon*, 150 F.3d at 1022 (9th Cir.1998) (*quoting* Fed.R.Civ.P. 23(b)(3)).

#### 3.1 Predominance

"The predominance inquiry of Rule 23(b)(3) asks 'whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir.2009) (quoting *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir.2001)). "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than an individual basis." *Hanlon*, 150 F.3d at 1022 (internal quotation marks omitted).

Rule 23(b)(3)'s predominance requirement is the focal point of Defendants' Opposition. Indeed, except for a single paragraph about superiority, three paragraphs on typicality, and a footnote challenging Plaintiffs' adequacy, Defendants' Rule 23 arguments concern predominance exclusively. The Court now considers whether individual or common questions predominate.

#### 3.1.1 Plaintiffs' Claims for Fraud and Negligent Misrepresentation

Defendants argue that Plaintiffs fail to establish predominance on its claims for fraud and negligent misrepresentation because individual issues concerning each investors' reliance on the alleged misrepresentations predominate over common issues.

Defendants further argue that individual issues concerning whether such reliance was justifiable also predominate over common issues. At the heart of Defendants' argument is their contention that the alleged misrepresentations were not sufficiently uniform to support a class-wide finding of justifiable reliance. The Court examines these arguments in turn.

#### *Whether Common Issues Predominate as to the Class Members' Reliance on the Alleged Misrepresentations*

Defendants argue that the Court should deny class certification of Plaintiffs' claims for fraud and negligent misrepresentation because these claims "require individualized inquiries as to ... whether investors relied on [REP or CB/REP's alleged] misrepresentations." (Opp'n at 14:11–13.) Plaintiffs do not dispute that reliance is a necessary element of their claims for fraud and negligent misrepresentation. (Motion at 12:25–28; Reply at 15:14–16:22.) Instead, Plaintiffs argue that individual inquiries are not required because "a class-wide inference of reliance" is appropriate under the circumstances here. (Motion at 15:11 (citing *Vasquez v. Superior Court*, 4 Cal.3d 800, 94 Cal.Rptr. 796, 484 P.2d 964 (1971)).) The Court agrees with Plaintiffs.

Defendants claim that Plaintiffs must "identify non-varying oral representations" (Opp'n at 1:27–28) to establish predominance because "[t]here [is] *no* basis to draw an inference of class-wide reliance without a showing that representations were made uniformly to all members of the class." (Opp'n at 19:3–4 (emphasis in original) (citing *Osborne v. Subaru of Am., Inc.*, 198 Cal.App.3d 646, 661, 243 Cal.Rptr. 815 (1988)).) Defendants misstate the law. In *In re First Alliance Mortg. Co.*, 471 F.3d 977 (9th Cir.2006), the Ninth Circuit held that a finding of class-wide reliance, for certification purposes, does not require alleged misrepresentations to be uniform.

In that case, loan officers for bankrupt subprime lender First Alliance made sales pitches to borrowers without disclosing certain hidden fees. A class action was brought against Lehman Brothers for aiding and

abetting the fraud as First Alliance's lender and underwriter. *Id.* After a jury found Lehman liable, Lehman argued on appeal that class certification was improper because First Alliance's oral misrepresentations to borrowers were not uniform. *Id.* at 990. Lehman specifically argued that the district court erred in certifying the class because the class members couldn't show that the alleged misrepresentations "were conveyed to borrowers in a uniform manner ... [or that] the uniform misrepresentations came directly from the written, standardized sales pitch." *Id.*

In affirming the district court's order granting certification, the Court of Appeals refused to adopt the "talismanic rule that a class action may not be maintained where a fraud is consummated principally through oral representations, unless those representations are all but identical." *Id.* at 991 ("observing that such a strict standard overlooks the design and intent of Rule 23") (citing *In re Am. Continental Corp./Lincoln Savings & Loan Sec. Litig.*, 140 F.R.D. 425 (D.Ariz.1992)).

> The Court of Appeals went on to say that [w]hile some other courts have adopted somewhat different standards in identifying the degree of factual commonality required in the misrepresentations to class members in order to hold a defendant liable for class-wide fraud, this court has followed an approach that favors class treatment of fraud claims stemming from a "common course of conduct." *See Blackie v. Barrack*, 524 F.2d 891, 902 (9th Cir.1975) ("Confronted with a class of purchasers allegedly defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in class members' positions.").

*Id.* at 990. As for the oral misrepresentations themselves, the court held that

> the exact wording ... is not the predominant issue. It is the *underlying scheme*

which demands attention. Each plaintiff is similarly situated with respect to it, and it would be folly to force each bond purchaser to prove the nucleus of the alleged fraud again and again.

*Id.* (emphasis added) (citing *Lincoln*, 140 F.R.D. at 431); *see also Menagerie Prods. v. Citysearch*, 2009 WL 3770668, \*5 (C.D.Cal. Nov. 9, 2009) (citing *First Alliance* and holding that "where a 'centrally-orchestrated scheme to mislead' is alleged, it is the scheme and not the details of any individual's experience that forms the nucleus of the class claims"); *see also McPhail v. First Command Fin. Planning, Inc.*, 247 F.R.D. 598, 609 (S.D.Cal.2007) ("Although defendants argue that actual sales pitches did not exactly follow the script and, therefore, the oral misrepresentations were never uniform, the Ninth Circuit's case law does not require identical misrepresentations to satisfy the commonality requirement.").

Defendants attempt to distinguish *First Alliance* by noting that "[*First Alliance* ] actually addresses the degree of proof necessary to establish commonality under Rule 23(a)," not "predominance under Rule 23(b)." (Opp'n at 20:25–28.) While Defendants are correct that the predominance inquiry is more demanding than Rule 23(a)'s commonality test, *see Amchem Prods.*, 521 U.S. at 623–24, 117 S.Ct. 2231, *First Alliance* establishes that a finding of predominance may also be based on non-uniform misrepresentations.

For example, the court in *First Alliance* cites the 1966 Advisory Committee notes to Rule 23(b)(3) to support the proposition that

> while a case may be unsuited for class treatment "if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed," a "fraud perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action."

*First Alliance*, 471 F.3d at 990 (citing Fed. R.Civ.P. 23, Advisory Committee Notes to 1966 Amendments, Subdivision (b)(3)). The court in *First Alliance* also drew an explicit contrast to *Moore v. PaineWebber, Inc.* 306

F.3d 1247, 1255 (2d Cir.2002), where the Second Circuit held that "a common course of conduct is not enough to show *predominance.*" (Emphasis added.)

While uniform misrepresentations are not necessary to satisfy Rule 23(b)(3)'s predominance requirement, dissimilar representations will not support a finding of predominance. *See Gonzalez v. Proctor & Gamble Co.,* 247 F.R.D. 616, 623 (S.D.Cal.2007). Thus, the Court must examine the representations allegedly made to the proposed class members to determine if they are sufficiently similar to support a finding of class-wide reliance.

### Whether the Alleged Misrepresentations Are Sufficiently Similar to Warrant an Inference of Reliance

Plaintiffs claim that most of the misrepresentations "commenced with cold calls to potential investors based upon substantially similar sales pitch scripts." (Motion at 3:27–28.) That script featured the Coldwell Banker name prominently:

> Hi _____, this is _____ with Coldwell Banker Commercial Real Estate Partners. How is your day going so far? Great. [I] wanted to take a second and let you know in the last 7 years we've become the 3rd largest Coldwell Banker franchise in the country with 1/2 Billion under management.

(Plaintiffs' Ex. 13; *see also* Exs. 12, 14–18.)

Defendants argue that the weight of the evidence belies Plaintiffs' claim that the sales pitches were substantially similar. (Opp'n at 19:13–17.) At the hearing on Plaintiffs' Motion, for example, Defendants stated that certain sales scripts used by CB/REP and REP representatives—namely those set forth in Defendants' Exhibits 4–6 and Plaintiffs' Exhibits 17—cannot support a class-wide inference of reliance because they do not contain references to Coldwell. But Defendants' Exhibit 4 and Plaintiffs' Exhibit 17 do indeed reference Coldwell. It is not significant, at least for purposes of the predominance inquiry, that the script at Exhibit 4 refers merely to a Coldwell Banker *franchise.* Nor is it especially significant that the words "Coldwell Banker" have been crossed out *in one*

*location* on the sales script at Exhibit 17 because the Coldwell Banker name appears elsewhere in the same script. Finally, Defendants' emphasis on the sales scripts at Exhibits 5 and 6 is somewhat overstated because both Exhibits contain the *same* script. This single script, unaccompanied by any evidence concerning the frequency or nature of its use, is insufficient to rebut Plaintiffs' showing that the sales pitches were substantially uniform.

Defendants also claim that inconsistencies between these declarations and the declarants' subsequent deposition testimony call into question the uniformity of these pitches. To support this argument, Defendants assert that four of the 18 deponents—Craig Gardner, Greg McGar, Nick Nicholas, and Carl Schulthess—"testified that they could not actually remember what they were told" when the REP or CB/REP salesperson called them. (Opp'n at 5:6–10.) This argument is unconvincing.

In his October 2011 deposition, for example, Gardner testified that he couldn't remember much about the content of the CB/REP sales call he received in January 2004—more than seven years earlier—but that he could remember that the salesperson who called him used the Coldwell name and discussed investments in distressed retail properties. (Defendants' Ex. 21 at 17–19.) Similarly, Schulthess testified that he could not recall the "specific language" used by the CB/REP salesperson, but that he did in fact remember that the caller said he was from Coldwell Banker Real Estate Properties, among other things. (Defendants' Ex. 24 at 12–13.)

Defendants also claim that the declarations shouldn't be accepted because the declarants refer to only two phone calls, while certain deponents acknowledged receiving three or more. But this fact doesn't dramatically undermine the declarants' claims that they received calls from salespersons who used the Coldwell name in similarly styled pitches. Defendants attack declarant Jeannelle Livingston for "testif[ying] about four sales calls, even though her declaration describes only two, one of which was with her husband." (Opp'n at 5:17–18.) But Livingston's cited

testimony does not substantially call into question the credibility of her sworn statement that a CB/REP representative "told [Livingston and her husband] that his company was selling shares in a Coldwell Banker investment fund." (Declaration of Jeanelle Livingston (Dkt. No. 68) ¶ 2.)

The minor inconsistencies between the declarations and deposition testimony do not sufficiently support Defendants' argument, at least for purposes of this Motion, that "the declarations ... include statements that are inaccurate and for which the Declarant lacks actual knowledge." (Opp'n at 5:27–6:2.) On the contrary, the declarations concerning sales pitches support Plaintiffs' contention that common issues of reliance predominate.

Defendants also argue that the sales pitches fail to justify class certification for reasons unrelated to their purported lack of similarity. First, Defendants contend that while Plaintiffs claim to have been contacted by a "Coldwell Banker Real Estate Partners" *representative*, the callers were actually *independent contractors*. (Opp'n at 3:10–15.) Whatever the merits of this argument, the callers' employment status has little, if any, bearing on Plaintiffs' ability to satisfy the predominance requirement of Rule 23(b)(3). Defendants next claim that Plaintiffs' sales scripts do not support certification because they do "not ... expressly state[ ] that the investment is a Coldwell product or that Coldwell 'backed' the investment. The scripts state, at most, that the caller is affiliated with a large Coldwell franchise." (Opp'n at 3:18–19.) But again, this argument—which concerns Coldwell's vicarious liability for REP and CB/REP's alleged misrepresentations—has little relevance to the predominance inquiry.

Aside from the sales pitches, Plaintiffs claim that similar misrepresentations were conveyed in brochures sent to the class members that "prominently featured the Coldwell logo and touted the Coldwell network." (*See, e.g.*, Plaintiffs' Ex. 9.) One of the Investment Fund brochures stated the following:

> Real Estate Partners has acquired a Coldwell Banker Commercial franchise and created a Special Assets Group that utilizes Coldwell Banker Commercial's extensive network to implement Master Services Agreements with financial institutions.... By taking advantage of the Coldwell Banker Commercial network Real Estate Partners is able to fully service Real Estate assets nationwide. This allows Real Estate Partners ... to have early access to a wider portfolio of assets meeting acquisition criteria.

Defendants also argue that the logos on the brochures are *franchise* logos—belonging to CB/AS, OCC, and REP, for example—not Coldwell itself. But individual inquiries are not necessary to determine whether the inclusion of franchise logos on the Investment Fund brochures precludes liability for Coldwell. For purposes of Rule 23(b)(3)'s predominance inquiry, the similarity of the brochures sent to class members further confirms that the *First Alliance* standard has been met.

Plaintiffs argue that REP and CB/REP made other substantially uniform misrepresentations to class members in press releases, on websites, and through other promotional materials. Because the Court finds that the sales pitches, combined with the Investment Fund brochures, are sufficiently similar to justify an inference of class-wide reliance under *First Alliance*, the Court need not address the effect of these additional items.

### *Whether Common Issues of Justifiable Reliance Predominate*

Defendants next argue that "individual issues *predominate regarding whether any reliance was justified* because the various oral representations Plaintiffs claim they received are contradicted by the written investment documents they signed." (Opp'n at 17:19–22.) To support this argument, Defendants focus on disclosures and disclaimers stating that REP, CB/REP, and CB/AS were not affiliated with Coldwell. One CB/AS disclosure, for example, states that

> Coldwell Banker Commercial American Spectrum is an authorized DBA of Real Estate Partners, Inc. as filed with the appropriate government agencies and the

franchisor of Coldwell Banker Commercial Corporation.

(*See, e.g.,* Plaintiffs' Ex. 2.)

■ But Plaintiffs' reliance is not necessarily unjustifiable merely because there is evidence showing that REP and CB/REP were unaffiliated with Coldwell. To establish justifiable reliance on the alleged fraudulent scheme, Plaintiffs need only show that the alleged misrepresentations were a "substantial factor" in inducing reliance. *First Alliance,* 471 F.3d at 992. As the Ninth Circuit stated in *First Alliance,*

> whether or not a borrower's reliance on misrepresentations was justified in this case depends on California law. To that end, the California Supreme Court has instructed that "a misrepresentation may be the basis of fraud if it was a substantial factor in inducing plaintiff to act and ... it need not be the sole cause of damage." *Vasquez v. Superior Court of San Joaquin County,* 4 Cal.3d 800, 94 Cal.Rptr. 796, 484 P.2d 964, 973 n. 9 (1971).

*Id.*

Because brochures and promotional materials with the Coldwell logo were distributed to all investors, whether or not the disclaimers they contain preclude reliance is a question that can be answered on a class-wide basis. Thus, the presence of these disclaimers does not defeat predominance at the certification stage.

### Whether Common Issues Predominate as to Agency–Based Liability

Plaintiffs' fraud and misrepresentation claims against Coldwell are based on a form of vicarious liability known as subsequent ratification. California Civil Code § 2307 provides that "an agency may be created and an authority may be conferred by a precedent authorization or a *subsequent ratification.*" (Emphasis added.) Plaintiffs allege that Coldwell is vicariously liable for the misrepresentations allegedly made by REP and CB/REP because Coldwell ratified this conduct after becoming aware of it. (Motion at 22:9–11; SAC ¶¶ 122–127.)

Defendants' only response to Plaintiffs' ratification theory comes in a four-sentence footnote, where they argue: (1) that ratifica-tion requires more than silence from the alleged principal; (2) that a " 'principal cannot ratify the act of an alleged agent unless the agent purported to act on behalf of the principal' "; and (3) that "Plaintiffs' ratification theory ... require[s] examining evidence from every investment transaction to determine whether those selling the REP investments purported to act '[for Coldwell Banker] and not for their own benefit.' " (Opp'n at 13:25–28 (citing *Emery v. Visa Int'l Serv. Ass'n,* 95 Cal.App.4th 952, 961, 116 Cal.Rptr.2d 25 (2002)).)

Defendants cite no cases to support their position that Coldwell could not have ratified REP and CB/REP's alleged wrongdoing by silence. While ratification normally requires a principal to have actual awareness of facts surrounding a transaction, willful blindness or an unreasonable failure to investigate, may be sufficient to establish liability. As the court stated in *Reusche v. Cal. Pacific Title Ins. Co.,* 231 Cal.App.2d 731, 737, 42 Cal.Rptr. 262 (1965),

> Ordinarily, the law requires that a principal be apprised of all the facts surrounding a transaction before he will be held to have ratified the unauthorized acts of an agent. However, where ignorance of the facts arises from the principal's own failure to investigate and the circumstances are such as to put a reasonable man on inquiry ... he may be held to have ratified despite lack of full knowledge.

In any event, the issue of subsequent ratification is common to the class and does not preclude a finding of predominance under Rule 23(b)(3).

Defendants' second argument fails because Plaintiffs provide sufficient evidence, at least for purposes of this Motion, that REP and CB/REP representatives purported to act on Coldwell's behalf. But more importantly, whether or not REP and CB/REP purported to act on behalf of Coldwell is a common question that can be decided by examining common evidence, without delving into the details of "every investment transaction." (Opp'n at 13:27.) As Plaintiffs explain in their Reply, REP and CB/REP's alleged references to Coldwell on sales pitches and the

use of Coldwell's name on Fund brochures—and Coldwell's alleged subsequent ratification of these practices—create a common question that predominates over questions affecting individual class members.

Because common issues predominate on Plaintiffs' subsequent ratification theory of vicarious liability, the Court need not determine whether Defendants may also be vicariously liable under alternate theories, such as ostensible agency.

### Conclusion

Plaintiffs' claims for fraud and negligent misrepresentation satisfy the predominance requirement of Rule 23(b)(3).

### 3.1.2 Plaintiffs' Claim for Negligence

Defendants argue that Plaintiffs fail to establish predominance on their negligence claim for the same reasons that Plaintiffs purportedly fail to establish predominance on their claims for fraud and negligent misrepresentation. In other words, Defendants assert that certification of Plaintiffs' negligence claim would be improper because justifiable reliance on uniform misrepresentations cannot be shown on a class-wide basis. (Opp'n at 13:17–14:10.)

■ Plaintiffs contend that Defendants' argument is flawed because misrepresentations and justifiable reliance are not elements of a negligence claim. (Reply at 4:4–9 (citing *Rosencrans v. Dover Images, Ltd.*, 192 Cal. App.4th 1072, 1082–87, 122 Cal.Rptr.3d 22 (2011) (stating that the elements of negligence are duty, breach, causation, and damages).))

The Court need not address this argument, at least for purposes of this Motion, because Plaintiffs have established that common issues concerning their justifiable reliance on substantially similar misrepresentations predominate over individual issues. (*See* Section 3.1.1 *supra*.) Accordingly, the Court finds that Plaintiffs' claim for negligence satisfies Rule 23(b)(3)'s predominance requirement.

### 3.1.3 Plaintiffs' Claim for Aiding and Abetting

Plaintiffs argue that Coldwell is liable for "aiding and abetting the fraud [and] negligent misrepresentations ... of the primary defrauders." (Motion at 23:16–17.) Defendants respond that Plaintiffs cannot establish predominance for their aiding and abetting claim because "individual issues predominate regarding whether Coldwell caused the class any injury." (Opp'n at 21:20–22:1.)

■ "Liability may be imposed on one who aids and abets the commission of an intentional tort if the person knows the other's conduct constitutes a breach of a duty and gives substantial encouragement to the other to act." *Peel v. BrooksAmerica Mortg. Corp.*, 788 F.Supp.2d 1149, 1161 (C.D.Cal. 2011) (quoting *First Alliance*, 471 F.3d 977, 993 (9th Cir.2006)). Predominance is satisfied on Plaintiffs' claim for aiding and abetting because questions of assistance and knowledge focus on Coldwell, not the alleged victims. *See Jenson v. Fiserv Trust Co.*, 256 Fed.Appx. 924, 926 (9th Cir.2007) ("[Defendant] either knew of [the third party's] scheme to defraud and took steps substantially to advance the scheme or it didn't. Either way, its knowledge and assistance (if any) predominates as a common issue."); *see also First Alliance*, 471 F.3d at 992–93 (affirming class-wide liability for aiding and abetting).

The predominance requirement is satisfied as to Plaintiffs' claim for aiding and abetting.

### 3.1.4 Plaintiffs' Claims for False Advertising

Plaintiffs do not argue that their claim for false advertising satisfies Rule 23(b)(3)'s predominance requirement. Indeed, Plaintiffs do not raise this claim anywhere in their Motion. In a footnote to their Reply, Plaintiffs' state that this omission was an inadvertent error, and then proceed to argue why this claim should be certified. (Reply at 10:23–28.) Because this argument was raised for the first time in Plaintiffs' Reply, Defendants have not had the opportunity to oppose it.

"[A]rguments raised for the first time in a reply brief are waived." *Turtle Island Restoration Network v. U.S. Dept. of Commerce,* 672 F.3d 1160, 1166 n. 8 (9th Cir.2012) (quoting *Graves v. Arpaio,* 623 F.3d 1043, 1048 (9th Cir.2010)).

The Court DENIES Plaintiffs' Motion as to their claim for false advertising.

### 3.1.5 Statute of Limitations

Finally, Defendants argue that none of Plaintiffs' claims satisfy Rule 23(b)(3)'s predominance requirement because "Coldwell's statute of limitations defense gives rise to individual issues." Plaintiffs filed this lawsuit in April 2010, and the longest applicable statute of limitations is three years. *See Cal. Proc. Code* § 338(d). On this basis, Defendants conclude that all claims accruing before April 2007 are time barred.

After stating that "statute-of-limitations defenses are appropriate for consideration in the class certification calculus," (Opp'n at 22:16–18 (citing *O'Connor v. Boeing N. Am., Inc.,* 197 F.R.D. 404, 411 (C.D.Cal.2000))), Defendants proceed to explain why the discovery rule does not enable Plaintiffs to claim that predominance is satisfied. *See Platt Electrical Supply, Inc. v. EOFF Electrical, Inc.,* 522 F.3d 1049 (9th Cir.2008) (holding that the discovery rule postpones the accrual date of a statute of limitations "until the plaintiff either discovers or has reason to discover the existence of a claim").

Defendants specifically contend that "each individual investor will have to prove his individual accrual date to benefit from the discovery rule or else his claim will be barred." (Opp'n at 23:7–8.) To show that individual accrual dates vary, Defendants cite testimony from three of the 18 class members that they deposed. Defendants note, for example, that Plaintiff Daniel Todd was "greatly" concerned about Coldwell's purported involvement when he received a letter from REP in November 2006 announcing that CB/REP's franchise with Coldwell had ended. (Defendants' Ex. 43 at 114:11–115:11.) Defendants further state that Livingston suspected that REP "stole [her] money" in January 2007 (*Id.* Ex. 27 at 61:21–62:19), and that Philip Fowler testified that

he became suspicious of fraud around the same time. (*Id.* Ex. 28 at 46:3–47:11.) Finally, Defendants claim that questionnaires that the SEC sent putative class members in 2006—which asked if they were "told about [REP's] relationship with Coldwell Banker"—put them on inquiry notice of the alleged fraud. (*Id.* Ex. 75 at 4.)

In their Reply, Plaintiffs argue that Defendants' statute of limitations argument does not defeat Rule 23(b)(3) predominance because the statutes of limitations didn't begin to run until *all* the elements of Plaintiffs' claims—including damages—accrued. (Reply at 20:10–11 (citing *Nodine v. Shiley, Inc.,* 240 F.3d 1149, 1153 (9th Cir.2001) (quoting *San Francisco Unified Sch. Dist. v. W.R. Grace. & Co.,* 37 Cal.App.4th 1318, 1335, 44 Cal.Rptr.2d 305 (1995) ("Under California law, the statute of limitations ordinarily begins to run on tort actions when the last element essential to a cause of action occurs."))).) Plaintiffs specifically allege that the class members did not suffer damages until 2010, when it was "conclusively determined ... that the assets of REP, the Investment Funds, and the REP principals would be insufficient to make the class members whole." (SAC ¶ 29.) According to Plaintiffs, this position can be established (or defeated) without inquiring into when individual class members were on inquiry notice of the alleged fraud.

But even if damages for certain class members did not accrue during the statutory period, "statute of limitations issues do not suffice to defeat Rule 23(b)(3) predominance when," as here, "important common issues otherwise exist, particularly in the investment fraud context." *Williams v. Sinclair,* 529 F.2d 1383, 1386–88 (9th Cir.1975) (reversing certification order and holding that "[t]he existence of a statute of limitations issue does not compel a finding that individual issues predominate over common ones. Given a sufficient nucleus of common questions, the presence of the individual issue of compliance with the statute of limitations has not prevented certification of class actions in securities cases."); *see also In re Cornerstone Propane Partners, L.P. Sec. Litig.,* 2006 WL 1180267, *6 ("given a sufficient

nucleus of common questions, the presence of the individual issues of compliance with the statute of limitations has not prevented certification of class actions in securities cases.") Thus, Defendants' statute of limitations defense does not defeat a finding that common questions predominate over individual questions.

### 3.1.6   Conclusion

Plaintiffs' claims for fraud, negligent misrepresentation, negligence, and aiding and abetting satisfy Rule 23(b)(3)'s predominance requirement. Because Plaintiffs fail to mention their claim for false advertising in their Motion, the Court DENIES the Motion as to this claim without considering whether common issues concerning false advertising predominate.

### 3.2   Superiority

Class actions certified under Rule 23(b)(3) must be "superior to other available methods for the fair and efficient adjudication of the controversy." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997) (*quoting* Fed.R.Civ.P. 23(b)(3)). "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Id.* at 617, 117 S.Ct. 2231. Rule 23(b)(3) lists four non-exclusive factors relevant to the Court's decision as to whether a class action is superior to other forms of litigation: (1) the class members' interest in controlling the litigation individually; (2) the extent of any pending litigation involving class members and the current controversy; (3) the effect of litigating all the claims in this forum; and (4) the difficulty in managing the case as a class action. Fed.R.Civ.P. 23(b)(3).

■ Plaintiffs argue that all four superiority factors favor certification, and the Court agrees. First, the class members have stated, in sworn declarations, that they have no interest in pursuing separate actions. Second, Plaintiffs claim, and the Defendants do not dispute, that "there is no other litigation commenced by class members against Coldwell." (Motion at 24:8–9.) Third, con-

centration of Plaintiffs' claims in this forum is appropriate because the investment contracts specify California law as the governing law, and this Court is familiar with the facts of *SEC v. Real Estate Partners, Inc., et al.*, Case No. 07–1022 AG (MLGx). Finally, Plaintiffs' class action is manageable, especially compared to the prospect of hundreds of individually filed cases. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir.2001) (Sotomayor, J.) ("Manageability concerns must be weighed against the alternatives and will rarely, if ever, be in itself sufficient to prevent certification of a class.") (internal quotation marks omitted).

Defendants dedicate one paragraph of their Opposition to arguing that Plaintiffs fail to establish superiority. In that paragraph, Defendants claim that a class action is not superior to individual lawsuits because "the average class members invested $35,850, a more than ample sum to attract legal representation." (Opp'n at 24:1–15 (citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 748 (5th Cir.1996) (finding that superiority may be lacking where "[t]he most compelling rationale for finding superiority in a class action— the existence of a negative value suit—is missing[.]")).) While Defendants correctly note that the average class member invested over $35,000 in the fraudulent scheme, this alone is insufficient under the circumstances to preclude a finding that Plaintiffs satisfy Rule 23(b)(3)'s superiority requirement. *See, e.g., In re Heritage Bond Litig.*, 2004 WL 1638201, *11 (C.D.Cal. July 12, 2004) (granting certification where many class members' damages exceeded $50,000).

Because all four Rule 23(b)(3) factors support certification, the Court finds that a class action is the best way to adjudicate this controversy.

### 3.3   Conclusion

The Court finds that Plaintiffs satisfy the Rule 23(b)(3) predominance and superiority requirements.

## 4.   TYPICALITY OF INVESTORS IN SPECIFIC REP FUNDS

Plaintiffs identify seven REP Investment Funds in their Motion: Income Fund I, In-

come Fund II, Income Fund III, Unit Investment Business Trust I, Unit Investment Business Trust II, Equity Fund, and Growth Fund. As previewed in Section 2.3, Defendants argue that any class certified should exclude investors in the Equity Fund and Growth Fund because their claims are "not typical" of the class claims. (Opp'n at 24:17–19.)

To support this argument, Defendants contend that callers pitching investments in these two funds were instructed *not* to make statements about Coldwell. (Opp'n at 25:7–8.) Defendants also assert that Coldwell terminated the CB/REP franchise *before* the Growth Fund opened and while shares of Equity Fund were still being sold. (Opp'n at 25:8–9) Finally, Defendants argue that the "Equity and Growth Fund brochures did not contain any logo or representation about any Coldwell franchise." (Opp'n at 25:10–11.)

The Court rejects Defendants' first argument because the typicality of the Growth Fund and Equity Fund investors depends not on whether REP or CB/REP representatives were *instructed* not to use Coldwell's name, but rather whether they *actually* refrained from using it. Defendants' second argument fails for a similar reason. While the date Coldwell terminated the franchise agreement may bear heavily on the issue of liability, it has little relevance to the typicality inquiry. Indeed, Plaintiffs present evidence showing that investors in the Growth Fund and Equity Fund—like investors in the other Investment Funds—received calls from REP and CB/REP representatives promoting products purportedly affiliated with Coldwell. David Powell declares, for example, that he purchased shares in Equity Fund—and only that fund—after allegedly receiving a call from a CB/REP representative "selling shares in a Coldwell Banker investment fund." (Plaintiffs' Ex. 68 at 92.) Livingston also received calls from CB/REP representatives even though she purchased shares in Growth Fund *only*.

Defendants' final argument is unconvincing because the evidence shows that the Growth Fund did in fact produce brochures containing logos with the words "Coldwell Banker Commercial." (Plaintiffs' Ex. 114.) Again,

whether or not Growth Fund was a "Coldwell franchise" at the time Plaintiffs received the brochure is beside the point. What matters for purposes of typicality is that Growth Fund investors—*like investors in the other Investment Funds*—received brochures with Coldwell logos.

## DISPOSITION

Plaintiffs' Motion for Class Certification is GRANTED as to Plaintiffs' claims for fraud, negligent misrepresentation, negligence, and aiding and abetting. The Motion is DENIED as to Plaintiffs' claim for false advertising.

The Class is defined to include "All persons and entities that paid money to invest in the Investment Funds." The Investment Funds are defined to include the seven Investment Funds identified in Plaintiffs' Motion—specifically, Income Fund I, Income Fund II, Income Fund III, Unit Investment Business Trust I, Unit Investment Business Trust II, Equity Fund, and Growth Fund. The following persons and entities are excluded from the Class: Defendants, REP, CB/REP, CB/AS, OCC, and all of their current and former officers, directors, management employees, successors, and wholly or partly owned subsidiaries or affiliated companies; class counsel and their employees and members; and the immediate family members of excluded persons.

IT IS SO ORDERED.